Grover MULLINS, Plaintiff,

v.

Robert H. FINCH, Secretary of Health,
Education and Welfare, Defendant.

Civ. A. No. 2442.

United States District Court
S. D. West Virginia,
Huntington Division.

Sept. 11, 1969.

Amos C. Wilson, Grubb & Wilson, Logan, W. Va., for plaintiff.

Wade H. Ballard, III, U. S. Atty., Bluefield, W.Va., and George D. Beter, Asst. U. S. Atty., Huntington, W. Va., for defendant.

CHRISTIE, District Judge:

This is an action under Section 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. This case was previously before the Court, however, on motion of the plaintiff the cause was remanded for further administrative action. Additional evidence was received and a supplemental hearing was held. Following this supplemental hearing the Secretary rendered his final decision on February 19, 1969, affirming and adopting the recommended decision of the hearing examiner. The final decision holds that plaintiff is not entitled to a period of disability or disability insurance benefits under the provisions of the act.[1]

■ Plaintiff meets the special earnings requirements of the Social Security Act through the quarter ending June 30, 1970. Under the provisions of the Act, 42 U.S.C.A. § 416(i), an individual cannot be considered to be under a disability unless he furnishes proof of the commencement of such disability at a time when he met the special insured status requirements. Davidson v. Ribicoff, 204 F.Supp. 368 (S.D.W.Va.1962). Thus, the burden is upon the plaintiff to establish by credible evidence that he is disabled within the meaning of the Act, though such proof need not be carried beyond a reasonable doubt. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964).

Plaintiff's application for a period of disability and for disability insurance benefits was filed on January 5, 1967, wherein he alleged he became disabled on April 4, 1966, due to his "back condi-

tion." In our previous opinion granting plaintiff's motion for a remand, we partly premised our holding on his assertion that he had additional medical evidence concerning his cardiovascular-bronchopulmonary impairment which he felt would materially affect the Secretary's ultimate disposition of his claim. This evidence was duly submitted by the plaintiff and received by the Secretary. Having considered the additional evidence, the Secretary rendered his final decision, as noted above.

■ The standard of review in actions of this nature is found in Section 205(g) of the Act, as amended, and is as follows:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

In short, the Courts are not to try the case de novo, and if the findings of the Secretary are supported by substantial evidence, the Courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). Nevertheless, it is said that this provision of the law does not contemplate that the Courts should surrender their "traditional functions," but rather that they will review the record as a whole, not for the purpose of making an independent finding, but to determine whether or not the administrative finding is supported by substantial evidence and to see to it that the administrative agency does not act arbitrarily or capriciously in denying just claims or allowing unworthy ones. Thomas v. Celebrezze, supra; Underwood v. Ribicoff, supra; Snyder v. Ribicoff, 307 F.2d 518 (4th Cir. 1962). In de-

---

[1]. The term "disability" is defined in Sections 216(i) and 223 of the Social Security Act, as amended, to mean: "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The 1968 Amendments to the Act imposed the additional requirement that "(A) an individual * * * shall be de-

termined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."

termining the meaning of "substantial evidence," the Courts have held it to be more than a scintilla, but less than a preponderance. Thomas v. Celebrezze, supra. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole. Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). The Fourth Circuit has pointed out that if there is only a slight preponderance of the evidence on one side or the other, the Secretary's findings must be affirmed. Underwood v. Ribicoff, supra. Therefore, the immediate task of this Court is to determine whether the defendant's denial of plaintiff's claim is supported by substantial evidence.

Plaintiff was born March 18, 1925, is married and the father of four children. The oldest of the children was seventeen years of age at the time plaintiff filed his application for benefits. The plaintiff has a sixth grade formal education and can read and write. A psychiatrist who examined him described plaintiff as having "marginal literacy." His principal work experience has consisted of eighteen years as a coal miner in the coal fields of southern West Virginia. This employment has been primarily that of a "shuttlebuggy" operator in the mines. He last worked in the mines in March of 1966, when he allegedly injured his back when his shuttlebuggy hit a deep hole.

The first medical evidence concerning plaintiff's condition is a series of reports from the Williamson Appalachian Regional Hospital. These reports are dated from March 8, 1966 through March 29, 1967. It appears therefrom that on March 15, 1966, he was referred to Dr. Duane A. Schram by Dr. J. W. Longacher. Dr. Longacher noted that plaintiff "had not improved sufficiently from March 8, 1966," and gave his impression of plaintiff's condition as "incipient lumbar disc." Plaintiff was seen at intervals of approximately one week at the hospital, and on May 12, 1966, he was examined by Dr. Russell Meyers, a neurosurgeon, who reported, "(I) believe patient has incipient H.L. disc L5–S1 with radiculitis now going into remission." Plaintiff continued to be seen by Dr. Schram at regular intervals for physical therapy through the year 1966, with no reported improvement. In a report dated January 17, 1967, there appears the following quote from Dr. Schram, "No change. P.T. only helps him for 30 minutes." On February 24, 1967, Dr. Schram felt plaintiff could not engage in any type of work.

Plaintiff was examined by Dr. Thomas F. Scott, a specialist in orthopedic surgery, on February 10, 1967, for the West Virginia Workmen's Compensation Fund. Upon physical examination Dr. Scott found that plaintiff "stands erect with the pelvis level." He found "no evidence of paraspinous muscle spasm" and "forward flexion about eight percent of normal." However, there was "tenderness to palpation over the body of the sacrum" and "moderate tenderness in both buttocks." Dr. Scott found the calf circumference to be equal, straight leg raising possible to 80 degrees bilaterally, and questionable hypesthesia over the lateral aspect of the calf. X-rays of the lumbar and lumbo-sacral spine were interpreted as showing "some osteophytic lipping of the body of the superior border of the third lumbar vertebra." These X-rays were also considered to show "some loss of lumbosacral joint space posteriorly." Dr. Scott felt, on the basis of this examination, that plaintiff did not have a protruding intervertebral disc at this time, although he also stated "I could not hazard an opinion as to whether he will have one at any time in the future."

Plaintiff was again examined by Dr. Schram on September 12, 1967, and on this examination it was found that "patient has a positive Laseque and sciatic nerve stretch tests on the left with a decreased ankle jerk on the same side." At this date, Dr. Schram made the following statement:

> "I'm still of the opinion that this patient has a protruded lumbar disc, probably at L–4–5 and is unable to perform any type of manual labor including so called 'light' work."

At the request of the Social Security Administration the plaintiff was examined by Dr. Carl J. Roncaglione, a full-time orthopedic specialist, on February 5, 1968. Dr. Roncaglione made an evaluation of his examination in a report dated February 8, 1968. Physical examination revealed "some stooping of the upper spine and swaying of the lumbar spine." The plaintiff could approximate his finger tips no closer than 18 inches to his toes while standing and no closer than 10 inches to his toes while sitting with his knees straight. The doctor found that the right calf measured 13¼ inches and the left calf 12¾ inches. Further, the right leg measured 34⅜ inches from the anterior spine to the medial malleolus and the left leg measured 35¼ inches in length. X-ray studies revealed an irregularity and narrowing between the bodies of L–2 and L–3 with most of the findings appearing to be present in the form of osteophytic formation on the right side. The diagnostic impression was hypokinetic musculoskeletal deficiency disease with muscular imbalance manifested by a loss of normal tone of abdominal and psoas muscle groups and shortening, tightening and contracture of the low back and hamstring groups which are obviously present on muscle and motion testing. It was Dr. Roncaglione's opinion that,

> "The functional limits imposed upon the patient now would probably be limited to no more than 1½ to 2½ hours of sitting or standing or walking or stooping or squatting at any time * * *."

The doctor further added that plaintiff could probably perform light physical activity as long as he had the prerogative to rest in whatever comfortable position he needed, including lying down. Dr. Roncaglione's opinion concerning plaintiff's ability to stay in one position for only short periods of time is supported by certain other probative evidence found in the record. In a report of a disability interview, made by the Logan District Office of the Social Security Administration, dated January 5, 1967, the interviewer noted that the claimant "changed position frequently." Furthermore, in a "Report of Contact," dated February 27, 1967, and signed by Mr. B. Spaulding, Logan District Office of the Social Security Administration, there appears the following observation:

> "W/E appears normal except for constant moving and shifting about in chair as if in a strain or distress."

At the supplemental hearing, plaintiff testified that when he drove from Dingess to Logan, a distance of about 18 miles, he always brought someone with him to drive home because he needed to shift around in the seat of the automobile. He further testified that while seated at the hearing he had to move himself around in his chair with the aid of his arms because of the discomfort caused by his back condition.

Dr. P. C. Davis, an internist, examined plaintiff and in a report dated October 18, 1968, he found (1) left knee jerk diminished and (2) left ankle jerk absent. It was his impression that plaintiff had undergone neurological changes, presumably caused by the back injury he had suffered in March of 1966. It is not clear from the record exactly what date Dr. Davis examined plaintiff, but we presume it was sometime in April of 1968 when plaintiff was in Beckley, West Virginia, for pulmonary function studies conducted by Dr. D. L. Rasmussen. The pulmonary function studies, which we will now consider, were incorporated in Dr. Davis' report.

Dr. D. L. Rasmussen, a recognized specialist of pulmonary disease, conducted extensive tests and examinations upon plaintiff on April 22–23, 1968. Dr. Rasmussen diagnosed plaintiff as having pneumoconiosis, category II–III p, and emphysema. Without considering his orthopedic impairment, Dr. Rasmussen had the following opinion on plaintiff's capacity to work with his pulmonary impairment:

> "This patient's capacity to perform physical work as a consequence of his pulmonary disease would appear to

have been reduced to a mild to moderate degree. The patient would appear to be capable of performing steady work at moderate levels without undue stress. A numerical estimate of his overall loss of capacity must be placed in the neighborhood of 60%. This loss of capacity appears to be the consequence of his occupational exposure."

Dr. W. E. Wilkinson, a psychiatrist, submitted a report dated November 21, 1968. After examining plaintiff, Dr. Wilkinson found no evidence of any significant psychiatric disorder present. However, on the Weschler Adult IQ Test, plaintiff scored only 78. This indicates that he does not have the intellectual ability to engage in abstract reasoning or make managerial judgments. But, notwithstanding, Dr. Wilkinson was of the opinion that if plaintiff was to be judged disabled, such "decision would have to be made on the basis of physical disabilities." The doctor clearly implies that there are no mental residuals that could be realistically considered.

Dr. Willard Pushkin, an internist, testified at the supplemental hearing as an independent medical witness. His testimony, given at the request of the hearing examiner, was based upon a review of the documentary medical evidence and not upon an examination of plaintiff. Dr. Pushkin completely agreed with the pulmonary disease finding of Dr. Rasmussen, indicating that in his judgment this pulmonary condition would be a moderate to moderately severe impairment. He first took the position that he could not accept the conclusion of Dr. Schram concerning plaintiff's orthopedic impairment, ("It would be very difficult for me to accept that as a valid medical impression"), then contradicted himself by saying that the positive Laseque tests, the decreased left ankle jerk and X-ray examination of lumbar spine indicating localized osteoarthritic changes in one or two vertebrae, suggest previous injury to the disc and that encroachment on the nerve was occurring. On cross-examination by plaintiff's counsel, Dr. Pushkin

admitted that if one lower extremity was smaller than the other (the difference in the circumference of plaintiff's right and left calves), the chances were good that there is nerve impairment and one extremity becomes smaller because of disuse. As we discern the medical expert's opinion from the record, he ultimately concludes that plaintiff is precluded from working in his former occupation due to his pulmonary disease and back condition, however, Dr. Pushkin was of the opinion that plaintiff was not precluded from all forms of substantial gainful activity.

The hearing examiner also called Dr. Karl F. Heiser, a vocational consultant, for the purpose of testifying as to the availability of jobs which plaintiff, with his particular history and residual capacity, could perform and which jobs existed in significant numbers within the national economy. Based upon the medical and nonmedical facets of plaintiff's case, Dr. Heiser enumerated several jobs which, in his opinion, plaintiff was capable of performing.

Plaintiff has had the burden of coming forward with competent evidence from which it can be established that he was unable, because of a medically determinable impairment, to engage in any substantial gainful activity. The Secretary's decision denying his claim rests almost entirely upon the conclusion of Dr. Pushkin that plaintiff was capable of engaging in some substantial gainful activity and the further conclusion, based upon Dr. Heiser's testimony, that jobs were available which an individual with plaintiff's capacity, as determined by Dr. Pushkin, was capable of performing. It is now the duty of this Court, viewing the record as a whole, to determine whether or not this finding is supported by substantial evidence. Thomas v. Celebrezze, supra; Underwood v. Ribicoff, supra.

■ Of primary importance for the purposes of the hearing examiner, as well as this Court, in reaching a decision in plaintiff's case is the weight to be given the testimony of Dr. Pushkin. It is clear

that the use of such testimony is not unusual in cases of this nature and that it has, in the past, received the sanction of the Courts. Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966). Indeed, it has been held that testimony by a physician, based upon a study of the medical record rather than an actual examination of the plaintiff, "may serve as a basis for an evidentiary inference as to the ultimate fact." Laws v. Celebrezze, supra at p. 644. Nevertheless, such testimony, as in the case of the Secretary's findings, must be based upon the record as a whole and upon "such evidence as a reasonable mind might accept as adequate to support a conclusion." Celebrezze v. Bolas, supra. Thus, in evaluating the significance of the medical evidence, the medical adviser, as well as the hearing examiner, is required to look to the evidence of record, and to this evidence only. Such is not only the rule of law but also the rule of common sense, inasmuch as neither the hearing examiner nor the medical adviser has personal knowledge of the case and they can reach their conclusions only on the basis of the record as it has been compiled during the administrative processing of the claim. It is on the basis of these simple, yet sometimes neglected, principles that we must now turn to an evaluation of Dr. Pushkin's testimony.

■ Dr. Pushkin, admitting the pulmonary disease impairment which precluded plaintiff's return to his former occupation or employment in any polluted environment, was of the opinion that even if there was an existing disc condition, the severity of such condition as to preclude light to moderate physical activity was not "medically determinable" by the medical evidence. This conclusion is directly contradicted by the record. Dr. Roncaglione, after conducting a thorough examination at the request of the Social Security Administration, concluded that plaintiff could stay in one position, even sitting, for no longer than 1½ to 2½ hours, and this with the prerogative to rest when he needed to do so. Dr. Meyers felt plaintiff's back condition necessitated surgery, and Dr. Schram,

who knew plaintiff's case thoroughly, having examined him on numerous occasions, concluded he could not do even "light" work. Moreover, we have long endorsed the rule that clinical medical reports are not of themselves dispositive of the question of a claimant's disability, Dillon v. Celebrezze, 345 F.2d 753 (4th Cir. 1965), but fall into an interrelation with other elements, among which are, in the instant case, documented observations by Social Security Administration employees that claimant appeared to be in "strain and distress" when sitting for just short periods of time.

Thus, the deficiency in Dr. Pushkin's testimony arises from his apparent incorrect conclusion in the face of the overwhelming weight of the medical evidence of record, rather than from any difficulty presented by the fact that he had not examined the plaintiff. Under these circumstances, little weight can be given to his conclusions that plaintiff is capable of engaging in sustained substantial gainful activity. Since the vocational testimony given by Dr. Heiser was evidently based upon the analysis of plaintiff's condition offered by Dr. Pushkin, it is entitled to no greater weight in this regard than that of Dr. Pushkin.

■ In making a determination concerning plaintiff's ability or inability to engage in any substantial gainful activity, consideration must be given not only to the objective medical findings, but also to the subjective evidence of pain and disability as well as plaintiff's educational background, work history and present age. Underwood v. Ribicoff, supra. The evidence presented in this case shows that at the time of his alleged disability plaintiff was 41 years of age and had a sixth grade education and "marginal literacy." His work history had been that of a coal miner, and even in this vocation, which does not generally require skilled labor, his duties involved primarily the simple task of running a shuttle buggy.

■ Consequently, viewing the record as a whole and giving particular consideration to the extensive medical docu-

mentation with respect to the existence of serious pulmonary disease and serious impairment of the lumbar spine, as well as plaintiff's age, education and work history, we are of the opinion that a disabling condition within the meaning of the Act has been established and that the Secretary's contrary conclusion lacks substantial evidentiary support.

Therefore, plaintiff is entitled to a period of disability and disability insurance benefits under the provisions of the Social Security Act upon his application filed herein on January 5, 1967. The Secretary's motion for summary judgment is accordingly denied.