**Mrs. Ethel L. RIDGELY, Administratrix of the Estate of Susanna Hape,**

**v.**

**SECRETARY OF the DEPARTMENT OF HEALTH, EDUCATION AND WELFARE of the United States of America.**

**Civ. A. No. 72-26-N.**

United States District Court,
D. Maryland.

July 5, 1972.

---

George W. White, Jr., and Robert Barker Harrison III, Towson, Md., for plaintiff.

George Beall, U. S. Atty., for the District of Maryland, and Jeffrey S. White, Asst. U. S. Atty., for defendant.

NORTHROP, Chief Judge.

This is an action brought by Mrs. Ethel L. Ridgely, daughter of Mrs. Susanna Hape, as administratrix of her late mother's estate, against the Secretary of the Department of Health, Education and Welfare, in which review is sought of the Department's denial of certain benefits under Part A of the Medicare Act, 42 U.S.C. § 1395c *et seq.* Mrs. Hape was transferred to the Foxleigh Nursing Home, an "extended care facility" (ECF) under the terms of the statute, after surgery at the Baltimore County General Hospital for the repair of a fractured hip. The surgery was performed on March 16, 1970, and Mrs. Hape was transferred to Foxleigh immediately upon the termination of her hospital stay on April 1, 1970. She remained a patient at Foxleigh until September 17, 1970, at which time she was retransferred from Foxleigh to the Baltimore County General Hospital on orders of the attending physician, Dr. Ruane, for treatment of a "DU embolism" which had manifested itself by a mottled, cyanotic and cold left foot. Mrs. Hape died in the hospital one week thereafter. She was 86.

Payments were made under the Medicare scheme for Mrs. Hape's stay at Foxleigh for the period April 1 through June 10, 1970. Apparently, it was determined that payments should cease as of June 1, 1970, but, inasmuch as payment had been "promised" through June 10, payments were made in fact through that date. Payments ceased, however, on June 11, the reason given for termination being that, at that point in time, skilled nursing care was no longer required for the patient's condition, and that "custodial care" was all that was required from that point forward. *Transcript*, pp. 48, 49. Custodial care is not reimbursable under the Medicare scheme, when such care is given in an

extended care facility such as Foxleigh. 42 U.S.C. § 1395y(a) (9). "Custodial care" appears not to be further defined in the Act (§ 1395x) nor in the regulations thereunder (20 C.F.R. Part 405.-310). Mrs. Ridgely was notified by letter that her claim for payment of the Foxleigh bill from the period June 11 through July 9, 1970 had been denied. The denial was affirmed on reconsideration. Thereafter, a hearing was held before Examiner George W. Blaine, who, in a written decision, denied the claimed benefits. This denial was affirmed by the Appeals Council of the Administration, whereupon this action was brought under 42 U.S.C. § 1395ff(b) seeking judicial review of the Departmental determination of disentitlement. The matter came on for trial before this Court on June 16, 1972. For the reasons we detail hereafter, this Court concludes, first, that it has jurisdiction to conduct such a review under § 1395ff(b), and, further, that the Departmental determination was erroneous in that it was based on an erroneous interpretation of the law and was not based on substantial evidence, and must, therefore, be reversed.

## I.

■■ The defendant, by the United States Attorney, has moved that the complaint in the instant case be dismissed for lack of jurisdiction over the subject matter, arguing that the scope of judicial review under the Act is limited to cases in which the "amount in controversy" exceeds $1000. Admittedly, all that Mrs. Ridgely seeks to recover in this action is $497.20. Plaintiff's Petition for Appeal, ¶ 3. Consequently, it would appear at first blush that the amount-in-controversy provision of § 1395ff(b) is not satisfied in the instant case. However, the only reported case which has considered the point seems to be squarely on all fours with the instant case, and it was concluded therein that where plaintiff seeks review of a decision that he is not entitled to any pay-ment for a specific service, as is the case here, no jurisdictional amount requirement need be satisfied; rather, the amount-in-controversy provision of § 1395ff(b) is only germane with respect to actions in which the plaintiff seeks review of the *amount* to which he has been found entitled, where a favorable decision on the issue of *entitlement* to payment has been made. In other words, if the issue is, does the entitlement to a particular payment exist?, no jurisdictional amount need be shown; if, on the other hand the issue is, how much?, then $1000 must be in controversy before a District Court will review the Departmental determination. The case to which the Court refers is, of course, the case decided by Judge Cassibry of the Eastern District of Louisiana, Cardno v. Finch, 311 F.Supp. 251 (1970). In that case, it was squarely held that where the issue sought to be reviewed is the existence *vel non* of an entitlement to payment for a particular service under Part A of Medicare, there is no requirement that the "amount in controversy" be $1000 or more. Judge Cassibry reached that conclusion after a careful and incisive analysis of § 1395ff(b) and its legislative history. The case is persuasive and should be followed by this Court.

■ The Court has carefully considered the argument advanced in the defendant's supplemental memorandum in support of its motion to dismiss but finds it to be without merit. The Government contends that the word "entitlement" was misunderstood by Judge Cassibry in *Cardno, supra,* in that "entitlement" is a word of art under the Social Security Acts, and, in the context of the Medicare provisions thereof, refers only to the personal status of an individual, *viz.,* whether or not a particular individual is an "insured" or "covered" person under the Medicare Act. The Government contends that "entitlement" as used in § 1395ff(b) of Title 42 is not to be given its ordinary meaning, that is,

whether a person is entitled to payment for a particular service or illness, but is to be read only as a "term of art" in the sense of whether an individual is entitled to any Medicare coverage at all. This argument must be rejected for two reasons.

First, since the cardinal sections of the Medicare Act, 42 U.S.C. §§ 426 and 1395c, define "entitlement" in the narrow sense of coverage wholly in terms of entitlement to receive benefits under another part of the Social Security scheme, *viz.*, the old-age benefits section (42 U.S.C. § 402), it would seem that the initial determination of entitlement, again used in its narrow sense, would be made under § 402, which is not a part of the Medicare Act. Now, that determination is already reviewable judicially, without the requirement of a jurisdictional amount, under § 405 of Title 42. Consequently, if one reads "entitlement" as used in the judicial review provision of the Medicare Act, 42 U.S.C. § 1395ff(b), in its narrow sense only, the Medicare Act's review provision reference to "entitlement" would be rather useless, and this Court will not presume that Congress enacted a statute without purpose.

Rather, the purpose of the statute, it seems to us, was correctly perceived by Judge Cassibry in *Cardno* when he read the word "entitlement" in § 1395ff(b) in its broader, plain sense, *viz.*, as dealing with entitlement for payment to be made to, or on behalf of, an insured individual in a particular case. Indeed, even though the defendant here argues for the narrow interpretation of "entitlement," it is clear from the record in this very case that the administrative interpretation of "entitlement" under the Medicare Act is the broad interpretation favored by Judge Cassibry in *Cardno, supra.* Thus, the hearing examiner below, in his written decision, framed the issue in the case as follows:

The issue to be resolved is whether the claimant *is entitled to have payment made* on her behalf for the services furnished by the ECF for the period from June 11, 1970, through September 17, 1970. This will depend upon whether these services meet the definition of "skilled nursing care on a continuing basis" within the meaning of section 1814(a) (2), or whether such services are precluded from coverage by the "custodial care" exclusion in section 1862(a) (9) of the Act. *Transcript,* p. 9. (Emphasis added).

To dispel any doubt that the issue below was framed in terms of "entitlement," the Court finds that the record below *consistently* speaks about the issues in this case as issues of entitlement. For example, on *Transcript* page 15 is found a "Notice of Hearing" which provides that the general issue to be determined "is whether the claimant is entitled to Health insurance benefits . . .," and the specific issues on which findings were to be made and conclusions were to be reached were stated as follows: "whether the claimant is entitled to have hospital insurance benefits for the cost of services at the Foxleigh Nursing Center . . . ; this depends upon whether the services were post-hospital extended care services . . . or whether such services were custodial in nature and thereby excluded from coverage . . . ." Finally, the Examiner, during the course of the hearing, framed the issues squarely in terms of entitlement in almost exactly the same words as are found in the Notice of Hearing referred to above. *Transcript,* p. 25.

This Court will not let the defendant change its horse in the middle of the creek. The entire proceedings below were, from their inception, exclusively framed in terms of entitlement to payment. Now, the administration argues that it does not really mean to speak of entitlements, but rather, of amounts of benefits. Thus, the proceeding is to be magically transformed from one concerning entitlement to one concerning

amount so that the administration may find shelter in the "jurisdictional amount" requirement of § 1395ff(b). Such a result would not only be unfair, but would not be in accord with the intent of Congress, and, hence, is rejected by this Court, which chooses to follow instead the reasoning in *Cardno, supra.*

Consequently, the Court concludes that it has jurisdiction to conduct a review, and the Government's motion for dismissal is denied.

## II.

██ On the merits, this Court concludes that the decision of the Department's Hearing Examiner, affirmed by its Appellate Council, was erroneous and was not supported by substantial evidence. 42 U.S.C. § 405(g). If the issue in a Section 405(g) review is the correctness *vel non* of a finding of fact made by the administrator, then, it is clear that the substantial evidence test applies, and "substantial evidence" has been defined as "more than a scintilla, but less than a preponderance . . . . It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be based on the record as a whole." District Judge Christie in Mullins v. Finch, 303 F.Supp. 1192, 1194 (S.D.W.Va. 1969). Of course, the District Court is not to try the case *de novo,* Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962), but the limited scope of review does not mean that "courts should surrender their 'traditional function.'" Rowe v. Finch, 304 F.Supp. 221, 222 (S.D.W.Va.1969), rev'd on other grounds, 427 F.2d 417. Consequently, this Court must apply the "substantial evidence" test to the administrator's findings of fact and the inferences drawn therefrom.

██ However, it is clear that there is no binding effect upon a reviewing court which must be given to conclusions of law reached by an administrative agency. *See, e. g.,* Social Security Board v. Nierotko, 327 U.S. 358 (1946); Conley v. Ribicoff, 294 F.2d 190 (9th Cir. 1961); Carroll v. Social Security Board, 128 F.2d 876 (7th Cir. 1942). Of course, the question then becomes, what is a conclusion of fact, and what a conclusion of law? This is a problem to which there is no easy answer, and indeed, scholarly treatment of the question does little to dispel the attendant confusion. *See,* Jaffe, *Judicial Review: Question of Law,* 69 HARV.L.REV. 239. It seems fair to say from the cases cited above that where the question in a case is whether or not the administrator correctly applied the found facts to a statute or regulation, the question is one of the interpretation of the statute, that is, what is the meaning of the statute's words, and does that meaning support the conclusion that the administrator reached on the facts before him? Of course, this approach must stand upon some degree of finality being accorded the administrator's findings, but that finality is achieved through the operation of the "substantial evidence" test. Thus, in cases where the question was whether or not a claimant was engaged in farm production where his land was farmed on a share-cropping basis, Conley v. Ribicoff, *supra,* and in cases where the question was the status of a receiver as an "employee" *vel non* under the Act, *Carroll, supra,* the Courts have exercised a degree of review over the matters of statutory construction and interpretation not confined to the narrow parameters of the "substantial evidence" test. Now, in this case, the question seems to be two-fold. If the question is looked at only from the standpoint of one of facts, the substantial evidence test must be applied; but if the question is looked upon as one of law, that is whether or not the Examiner correctly concluded that, upon the facts found by him, Mrs. Hape received only custodial care, then the scope of review is broader, and this Court need not fol-

low the Examiner's interpretation of the words "custodial care."

██ Such a bifurcated position was taken, though not in terms articulated, by the court in one of the few cases which have dealt with the point involved in the instant case, *viz.*, whether or not an entitlement was properly disallowed under the "custodial care" provision of § 1395y(a) (9). In Sowell v. Richardson, 319 F.Supp. 689 (D.S.C.1970), Judge Hemphill reversed the Secretary's decision and entered judgment for the plaintiff, administrator of the claimant's estate. In that case, the decedent was a 72 year old woman who was transferred from a hospital to an ECF, her diagnosis upon admission revealing (1) carcinoma of the breast with widespread metastases; (2) diabetes; (3) cataract in the left eye; and (4) pulmonary emphysema. The patient, while in the ECF, could ambulate with full weight-bearing, could sit up in a chair, and could tolerate moderate activity. The Government urged that "covered care" meant only such treatment as "must be given under the supervision of a registered professional nurse." Further, it contended that the exclusion barring payment for "custodial care" cuts off all payment except for health services "which can *only* be provided in an institutional setting by trained and skilled professional personnel." Likewise, it was urged that such services "must be an extension of the medical treatment the beneficiary received in a hospital." 319 F.Supp. 689, 691. After pointing out that he had found no authority defining the meaning of "custodial care," Judge Hemphill proceeded to reject the Government's administrative interpretation, which he characterized as a "restrictive definition of the extended care provisions." After pointing out that the Act must "be construed liberally to effectuate the [remedial] Congressional purpose," Judge Hemphill said, and we quote extensively from his opinion:

. . . Neither the courts nor the Secretary should, in the interest [of] minimizing costs so interpret the provisions of the Act as to frustrate its purpose. A sensible nontechnical approach to interpretation of this chapter is necessary in order to give effect to the purposes of the Act and to afford equitable treatment to those seeking its benefits. . . .

The position taken by the Secretary is not in accord with these principles. Under his formula for determining whether the services are covered only the service actually rendered is considered. The condition of the insured and manifest symptoms of the illness are in his view only relevant to the extent that they determine the treatment administered. Were the law as contended by the Secretary, consideration of the trees is commanded but even a glimpse of the forest prohibited. It was never intended by Congress that the condition of the insured, treatment that might at any time be necessary, and the pain and discomfort attending inadequate or unprofessional care or lack of care not be considered together with treatment actually provided in determining whether extended care services are justified. Every aspect of the plaintiff's physical condition must be considered in making the determination. Treatments immediately required are of course a major factor. However, even if no treatment were required the condition of the insured might be so unstable or unsatisfactory, as to require the extended services contemplated by the statute. 319 F.Supp. 689, 691–692.

Consequently, it is manifestly clear that the interpretative lodestone for Judge Hemphill was a consideration of the patient's condition as a whole, *not* merely a consideration of the course of treatment administered in the ECF. The only

clues we have in the record in the instant case as to the administrative interpretation employed by Examiner Blaine are his references to the records of Foxleigh, that is, Mrs. Hape's charts, physical therapy notes, doctor's order sheets, doctor's progress notes, nursing notes, and physical therapy progress notes. Based upon these notes, these reports of treatment actually furnished, he concluded that *"care* received subsequent to June 10th was primarily supportive in nature, and, therefore, specifically excluded from coverage by the 'custodial care' exclusion in section 1862(a) (9) of the Act [42 U.S.C. § 1395y(a) (9)]." *Transcript,* p. 12. Consequently, it is clear that the interpretation used by the Examiner in this case of "custodial care" was essentially, if not exclusively, the treatment interpretation condemned by Judge Hemphill in *Sowell, supra,* and, hence, was an incorrect interpretation of the statute. The Examiner seemed to exclude altogether from his *conclusion* any consideration of Doctor Greenstein's letter of October 28, 1970, as amended by the addendum of February 4, 1971 (*Transcript,* pp. 133 and 134) which more than adequately bespoke the pitiable physical condition of Mrs. Hape. Consequently, the Examiner erred in not applying the "total patient condition" test to the facts in denying benefits, and for that reason, the adjudication of the Department must be reversed.

It is clear to this Court that the record below, as a whole, plainly shows the condition of the decedent to have been such at all times relevant hereto that her treatment was not mere custodial care. The *substantial evidence* in the case, not just that gleaned from a review of the patient's routine ECF charts, but that which relates to her condition as a whole, can compel no other conclusion but that she was not furnished merely custodial care.

First, there is the letter from Dr. Greenstein alluded to earlier. *Tran-*

*script,* pp. 133 and 134. The letter as it stood at the time of the hearing consisted of two parts, the first having been written in October of 1970, and the second having been added at the request of the Secretary for "clarification" on February 4, 1971. The examiner quotes these letters in full in his decision, but he makes absolutely *no* comment upon their contents. Rather, the letters are merely inserted in the Examiner's chronological detailing of the treatment reports of the ECF. The October letter said, in pertinent part:

> When [Mrs. Hape] was discharged from Baltimore County General Hospital on April 1st, her medical condition was such that it would have been dangerous to treat her at home. Accordingly, she was admitted to the Foxleigh Nursing Home where she could be under proper medical and nursing supervision at all times. She was confused much of the time and if she had been permitted to remain unsupervised, the internal fixation of her fracture would undoubtedly have failed from unauthorized weight bearing.

In fact, even with the close supervision furnished at Foxleigh, Mrs. Hape managed to engage in unauthorized weight bearing, which resulted in a fall necessitating additional nursing care, and this fall occurred on July 9, 1970, at a time when, according to the administrator, no nursing supervision was necessary, but only "supportive" care was necessary! Had not she been receiving the close professional supervision she did receive at Foxleigh, had she been at Mrs. Ridgely's home, one wonders how many other and perhaps more serious falls and injuries she would have sustained. Getting back to Dr. Greenstein's letter, we note with great interest and some amusement the addendum he put on the letter for the benefit of the administration:

> It has come to my attention that my above note does not satisfy the rigid

bureaucratic requirements which apparently leave no room for intelligent interpretation of what a doctor says. Therefore, I will attempt to translate as follows: My sentence which reads 'accordingly she was admitted to Foxleigh Nursing Home where she could be under proper medical and nursing supervision at all times' means specifically that she did require the supervision of professional nurses and that she did specifically require professional nursing care. My next sentence left no question as to my professional opinion in this matter.

Further, the fact that compression fractures were diagnosed certainly further indicated the *continued necessity* for professional nursing supervision and care.

Must we doctors take specialized courses in semantics to try to satisfy ridiculous phraseology requirements where there is such a horrendous shortage of professional personnel available to render patient care? [Emphasis added].

This letter, which apparently was given *no* weight by the Examiner, is strikingly similar to a letter considered by Judge Hemphill in *Sowell, supra,* when he concluded that the Examiner's conclusion that the care furnished was merely custodial care was not a conclusion rooted in substantial evidence. 319 F.Supp. 689, 692, n. 1. Juge Hemphill accepted this letter as substantial evidence of the necessity for professional nursing care in a case in which the Examiner below, as did the Examiner in the instant case, relied upon the course of treatment actually given in the ECF with no apparent credence given to the physician's impression of total condition, with reference to the need for professional care as distinguished from merely custodial care. *Cf.,* Johnson v. Finch, 328 F.Supp. 1169 (E.D.La.1971), in which Judge Boyle, in reversing for

want of substantial evidence the Department's determination that a certain hospital admission was not an "emergency" under the Medicare Act, laid particular reliance upon the admitting physician's assessment of the patient's condition.

In a case which is very similar to the factual pattern involved in the instant case, although dealing with emergency hospitalization under a different part of the Medicare Act, Judge Orma Smith of the Northern District of Mississippi reversed a determination by the Secretary that an emergency condition for which the patient was admitted had terminated after her initial 30 days' stay in a hospital; thus, the case involved an "on-again, off-again" situation like that of the instant case. The administrator had refused entitlement because:

> [F]ollowing such 30 day period, the claimant's respiratory condition, for which she had been admitted on an emergency basis, was stabilized and it would have been safe from a medical standpoint to have moved her . . . .. The medical emergency therefore terminated at the end of the first 30 days. Brewerton v. Finch, 320 F.Supp. 68, 69 (1970).

In the *Brewerton* case, it is clear that the Government was following a "course of treatment" sort of rationale in denying entitlement. Judge Smith, however, found that the decision below was not supported by substantial evidence where the administrator had, in effect, disregarded the patient's physician's evaluation:

> This court is well aware that the patient's attending physician's opinion is not a binding conclusion which the Secretary must accept, but in instances such as the facts shown to exist in the case sub judice where there is no *conflicting* evidence, this court is of the opinion that his decision is to be given great weight in the determi-

nation of the patient's condition. 320 F.Supp. 68, 71. (Emphasis added).

It is to be noted in the instant case that although there are indications in the course-of-treatment records relied upon (virtually exclusively) by the Examiner, that Mrs. Hape was not on death's doorstep at all times, there is no medical evidence in the file which *conflicts* with Dr. Greenstein's medical assessment. It is to be noted that the Carrier's denial of coverage for the period after June 10, 1970, was based on a review of the medical review questionnaire (MRQ) submitted to the Carrier by the ECF. *Transcript*, p. 48. The latest-dated MRQ in the record, and the one upon which disapproval is noted by the Carrier, is to be found at p. 51 of the Transcript and does not suggest even remotely that there had been a change in the type of treatment required by the patient. It only says that the patient "may progress to full weight bearing $\bar{c}$ walk[erette]." The Court fails to perceive any substantial evidence in this MRQ that there had been a change in condition sufficient to warrant a cutting off of benefits as of June 10. It is also to be noted that the Institutional Utilization Review Committee, in that same MRQ, approved the requested benefits (for the period in question). It is also a piece of substantial evidence, not adverted to by the Examiner, that the institutional attending physician, Dr. Vicente Ruane, certified that from the 74th to the 100th day of Medicare (which includes the period in controversy here—the 100th day was July 9th), ECF in-patient care was necessary on account of the hip fracture. *Transcript*, p. 52. And if one wants to confine one's self to the Foxleigh records, one will find many indicia that the patient's condition was such that more than custodial care was required. Thus, one finds instances, in the nursing notes, of the requirement of professional nursing care for the period in question: chronic irritability; requests for bedpan 15 times per night, without being able to make use thereof; falling on way to the bathroom; poor appetite; refusal to take medication, and so forth. Transcript, *passim*, at 113–27. The Examiner laid some stress upon the fact that Mrs. Hape was able to leave the ECF with her daughter to have x-rays taken, but a closer look at that episode shows that this was as a direct result of her July 9th fall, yet this trip was on July 23rd, *after* the 100 days' eligibility had expired, and was an essential excursion made only for medical purposes; it was certainly not a frolic and a banter unnecessary under the circumstances. Transcript, pp. 12 and 25.

Indeed, the final step in this Court's conclusion that the decision below does not rest upon substantial evidence is the apparent lack of attention which the Examiner gave the report made to him by the ECF itself, which, whether read alone or in conjunction with Dr. Greenstein's letter, certainly paints a picture of Mrs. Hape such that it would be concluded by any reasonable standard that hers was not a case in which merely custodial care was required:

> This 85 year old caucasion [sic] female was admitted to Foxleigh from Baltimore County General Hospital on 4/1/70 with a diagnosis of fracture right hip with foley catheter, incontinency of feces and hearing loss . . .. The patient . . . refused to continue physical therapy and at the same time she was very hard of hearing and it was very difficult to make her understand that the doctor's orders must be carried out. *Transcript*, pp. 136 and 137.

Although the last sentence quoted above relates to the latter part of her stay at Foxleigh, it is clear that Mrs. Hape's hearing problem was extant at the time of her admission to the ECF and her general inability to follow doctor's instructions led to her fall on the last day

of the covered period, July 9th. How then, can it be said that she did not require professional nursing care the whole time she was at Foxleigh, including the period June 10th through July 9th? Indeed, it appears that Mrs. Hape needed constant attention from skilled nursing personnel in order to avoid further disaster, attention which it would have been impossible to have furnished at home with Mrs. Ridgely, and attention which was more than mere supportive or so-called "custodial" care, and the Court so concludes from the substantial evidence in the record.

■ Indeed, it appears to this Court that the purpose of the custodial care disqualification in § 1395y(a) (9) was not to disentitle old, chronically ill and basically helpless, bewildered and confused people like Mrs. Hape from the broad remedy which Congress intended to provide for our senior citizens. Rather, the provision was intended to stop cold-blooded and thoughtless relatives from relegating an oldster who could care for him or herself to the care of an ECF merely so that that oldster would have a place to eat, sleep, or watch television. But when a person is sick, especially a helpless old person, and when those who love that person are not skilled enough to take care of that person, Congress has provided a remedy in the Medicare Act, and that remedy should not be eclipsed by an application of the law and findings of fact which are blinded by bureaucratic economics to the purpose of the Congress.

For all the reasons stated above, and pursuant to 42 U.S.C. §§ 405(g) and 1395ff(b), it is hereby ordered that the final judgment of the Secretary in this case be, and the same hereby is, REVERSED. There being no need to remand the case to the Secretary, judgment is accordingly entered for the plaintiff and against the defendant in the amount claimed, $497.20, together with costs.