Kate HARRIS

v.

Elliot L. RICHARDSON, Secretary,
Health, Education and Welfare.

Civ. A. No. 232-72-R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 17, 1973.

Louis C. Shell, Petersburg, Va., for plaintiff.

Dennis W. Dohnal, Asst. U. S. Atty., Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Kate Harris seeks review of a final decision of the Secretary of Health, Education and Welfare which holds that

she is not entitled to have payment of hospital insurance benefits made on her behalf for services provided to her at the Robert E. Lee Nursing Home, a participating extended care facility under the program of health insurance for the aged as per Title XVIII of the Social Security Act, 42 U.S.C. § 1395d. Jurisdiction is attained pursuant to 42 U.S.C. § 1395 et seq.

The sole issue before the Court is whether the final decision of the Secretary is based upon substantial evidence. See 42 U.S.C. § 405(g). The defendant has moved for summary judgment and the plaintiff, given an opportunity to respond, has failed to do so. It is upon the records and pleadings before it that this matter is ready for disposition.

■■ The function of the Court is not to try this matter *de novo,* nor to resolve mere conflicts in the evidence. The Court, however, is duty bound to give careful scrutiny to the entire record to assure that there is a sound foundation for the Secretary's findings, and that his decision is rational. Vitek v. Finch, 438 F.2d 1157 (4th Cir. 1971); Bridges v. Gardner, 368 F.2d 86 (5th Cir. 1966).

Miss Harris, who was born on April 8, 1882, was hospitalized at the Petersburg General Hospital from January 3, 1971 to January 21, 1971, upon order of her attending physician, Dr. Alvin Cohen. Diagnosis at admission was arteriosclerotic heart disease, with congestive failure, compensated; degenerative arthritis; and post-operative status catarectomy. While hospitalized she was treated with intramuscular Lasix, a diuretic, with Digitoxin and with ACTH. Her condition improved and by January 21, 1971, she was transferred from the hospital, to make hospital space for an acutely ill patient seeking admission, to the Lee Nursing Home. The admitting diagnosis at Lee was also arteriosclerotic heart disease with congestive failure

and chronic degenerative arthritis. She remained at Lee until April 6, 1971. While at Lee she was continued on Lasix and Digitoxin, given other medications and physical therapy.

Prior to her transfer to Lee, Miss Harris' nephew, John Temple, took steps to ascertain whether the services there provided would be covered by Medicare. On January 29, 1971, the Utilization Review Committee at Lee reviewed plaintiff's records and determined that as medical treatment of the nature covered by Medicare (*infra*) was required rather than custodial care, which is not covered by Medicare, that continued treatment under the Medicare program was justified. In spite of this favorable determination of the Lee Committee and assurances by Medicare officials to Mr. Temple that he would be promptly notified as to whether or not these services were covered, Mr. Temple did not receive notification until March 29, 1971, that Miss Harris was not covered.

Mr. Temple, on behalf of his aunt, requested a hearing with an H.E.W. hearing examiner on June 8, 1971. Upon a hearing held August 5, 1971, the examiner determined that Miss Harris was entitled to coverage. Subsequently, on its own motion, the Appeals Council reviewed the award to the plaintiff and upon a hearing reversed the decision of the examiner. Miss Harris commenced this action within sixty days of notification of the Appeals Council decision in order to seek review of what is, by virtue of the Appeals Council determination, the Secretary's final decision.

■ The precise issue in this matter is whether the care administered to Miss Harris while at Lee was custodial (supportive) or skilled nursing care. Only the costs incurred for the latter are reimbursable under Medicare.[1] 42 U.S.C. § 1395y(a)(9).

While the term "custodial care" is not further defined beyond the meaning im-

---

1. There was no question that Miss Harris was entitled to hospital insurance benefits, per se, or that Lee was a proper

"provider of services" within the meaning of the Act. See Hearing Examiner's Decision (Tr. 33).

parted by the words themselves, see 42 U.S.C. § 1395y(a)(9), 20 CFR § 405.-310(g), Ridgely v. Secretary of H.E.W., 345 F.Supp. 983 (D.Md.1972), ample explanation is given to the term "skilled nursing service."[2] The latter term is amplified by 20 CFR §§ 405.27 and 405.28, which read in pertinent part:

§ 405.127 Posthospital extended care; skilled nursing services.

(a) *Defined.* A skilled nursing service is one which must be furnished by or under direct supervision of licensed nursing personnel and under the general direction of a physician in order to assure the safety of the patient and achieve the medically desired result. Skilled nursing includes:

(1) Observation and assessment of the total needs of the patient;

(2) Planning and management of a treatment plan; and

(3) Rendering direct services to the patient.

(b) *Specific services; services which are skilled.* Based upon the general principles set forth in paragraph (a) of this section skilled nursing services include but are not limited to:

(1) Intravenous or intramuscular injections and intravenous feeding;

*  *  *  *  *  *

(7) Heat treatments specifically ordered by a physician as part of active treatment and which require observation by skilled personnel to adequately evaluate the patient's progress;

*  *  *  *  *  *

(9) Restorative nursing procedures including the related teaching and adaptive aspects of skilled nursing, which are part of active treatment and require the presence of licensed nurses at the time of performance.

(c) *Evaluation of services as skilled or unskilled.* In evaluating whether services not enumerated in paragraph (b) of this section are skilled or un-

skilled nursing services, the following principles shall be applied:

(1) The classification of a particular service as either skilled or unskilled is based on the technical or professional training required to effectively perform or supervise the service. For example, a patient, following instructions, can normally take a daily vitamin pill. Consequently, the act of giving the vitamin pill to the patient because he is too senile to take it himself would not be a skilled service. Similarly, State law may require that all institutional patients receive medication only from a licensed nurse. This fact would not make administration of a medication a skilled nursing service if such medication can be prescribed for administration at home without the presence of a skilled nurse.

(2) The importance of a particular service to an individual patient does not necessarily make it a skilled service. For example, a primary need of a nonambulatory patient may be frequent changes of position in order to avoid development of decubiti. Since changing of position can ordinarily be accomplished by unlicensed personnel, it would not be a skilled service.

(3) Skilled paramedical service involving specialized training outside the nursing curriculum are not skilled nursing services. For example, physical, occupational, and speech therapy are discrete treatment modalities requiring specialized training for proper performance. A need for one or more of these therapies would not necessarily indicate a need for skilled nursing care.

(4) Any generally nonskilled service could, because of special medical complications, require skilled performance, supervision, or observation. In such cases, the complications and special services involved must be docu-

**2.** Subsequent 1972 amendments to the Act with respect to the definition of nursing care are not applicable to this action.

See Public Law 92–603, section 247, amending 42 U.S.C. § 1395f.

mented by physician orders and/or nursing notes. For example, the existence of a plaster cast on an extremity would not generally indicate a need for skilled care. However, a preexisting acute skin problem and a need for special traction of of the injured extremity might require skilled personnel in order to properly observe for complications and adjust traction accordingly. Such procedures would be undertaken only on physician order and would be documented in nursing reports. The possibility of adverse effects from improper performance of an otherwise unskilled service does not make it a skilled service.

(d) *Specific services; supportive or unskilled services.* Supportive services which can be learned and performed by the average non-medical person (and which are not skilled services in the absence of conditions specified in paragraph (c)(5) of this section) include but are not limited to:

(1) Administration of routine oral medications, eye drops, and ointments;

\* \* \* \* \* \*

(9) Use of heat for palliative and comfort purposes;

\* \* \* \* \* \*

(11) General supervision of exercises which have been taught to the patient; ·

(12) Assistance in dressing, eating, and going to the toilet.

[F.R. 10849, June 4, 1971]

§ 405.128 Posthospital extended care; "continuing basis."

Skilled nursing services are required on a continuing basis (see § 405.126) when the continuing availability of skilled nursing personnel is warranted. In determining whether the continuing availability of skilled nursing personnel is warranted, the following principles apply:

(a) *Frequency of services.* The frequency of skilled nursing services required, rather than their regularity, is the controlling factor in determining whether the continuing availability of skilled nursing personnel is warranted. For example, a patient may require intramuscular injections on a regular basis every second day. If this is the only skilled service required, it would not necessitate the continuing availability of skilled nurses.

(b) *Observation.* Observation may be the principal continuous service when the unstabilized condition of the patient requires the skills of a licensed nurse to detect and evaluate the patient's need for possible modification of treatment or institution of medical procedures. For example, pending stabilization of the condition, a patient suffering from arteriosclerotic heart disease may require continuous close observation by skilled nurses for signs of decompensation and loss of fluid balance in order to determine whether the digitalis dosage should be changed or other therapeutic measures should be taken. Similarly, in some cases, surgical patients (including cataract patients) are transferred from a hospital to an extended care facility while still in the immediate unstabilized post-operative period during which the possibility of adverse reaction to anesthesia and other aspects of the operative procedure necessitates close skilled monitoring. (This latter situation is, of course, the converse of the "uncomplicated" convalescent stage following the "average" hospital stay for surgery.)

The medical testimony before the Secretary indicates that Miss Harris received essentially the same treatment at Lee as she was given during her hospital stay. The Hearing Examiner concluded in this regard:

In addition to the opinion of the attending physician, there is the certification and recertification by the Utilization Review Committee of the extended care facility. Thus it was the judgment of all of the physicians who had access to her records at that time

that it was essential that she continue to have the level of care offered in the extended care facility. [Tr. 39].

The Appeals Council was, according to its opinion dated March 28, 1972, motivated to the opposite conclusion by three factors: first, the nurses' notes at Lee were not written on a daily basis, which the Council interpreted as probative of a lack of skilled nursing care on a continuous basis. Second, the Secretary's medical advisor testified that the services received could have been administered at home with regular visits from the attending physician. Third, these factors were considered within the context of the "custodial care." The Council defined "custodial care" as "care designed essentially to assist an individual in meeting the activities of daily living . . . . These services do not require the continuing assistance of trained medical or paramedical personnel." [Tr. 8].

█ The Court finds that the Appeals Council decision was not based upon substantial evidence and so concludes for two major reasons. First, as noted by the Hearing Examiner, physicians attendant upon Miss Harris were unanimously of the opinion that she required skilled nursing care. For example, in a letter dated September 13, 1971, Dr. Cohen stated:

Miss Harris was admitted to Petersburg Hospital on January 3, 1971, with the diagnosis of congestive heart failure, early pulmonary edema, bilateral pleural effusion, generalized degenerative arthritis and cerebral arteriosclerosis. During her hospitalization, she was treated with digitalis, diuretics and started on a prescribed course of physical therapy—supervised by a competent therapist—aimed at restoring a satisfactory degree of function to her arthritic joints, in-

cluding a goal of returning her to her previous ambulatory state through the proper therapeutic exercises.

Miss Harris' cardiovascular status improved with the aforementioned treatment. Improvement in joint function and ambulation, however, was less than satisfactory. It was my opinion, nevertheless, that further improvement could be obtained by continuation of the physical therapy regimen. However, since hospital beds were scarce at that time, I felt that that therapy could and should be continued in an extended care facility. . . . Because of assurances that she probably would be covered, Miss Harris was transferred to the Lee Nursing Home.

At the nursing home, treatment was continued essentially unchanged from that administered at the hospital—treatment which was covered by Medicare in the hospital. Continuation of that therapy was necessary, in my opinion, in order to attain the goal of restoring satisfactory joint function and ambulation capability to Miss Harris. I believe this goal was attained during her nursing home stay and that recurrent hospitalization may have been avoided because of the course we pursued.

Dr. Cohen and the Lee Committee on two occasions concluded that the services thus required fall within the ambit of the afore-cited regulations.[3] In that light, the lack of daily nursing notes at Lee, while perhaps probative, is, in the Court's opinion, by no means conclusive as to the medical observation and daily care received. Those notes which are recorded, moreover, indicate a pattern of daily observation rather than periodic examination [Tr. 141], prompting a conclusion that the notes may not truly reflect the nature of the case given.

3. The Court recognizes that the opinions of examining physicians in Medicare cases are usually entitled to less weight than in disability cases because said opinions are not free from self interest. See Weir v. Richardson, 343 F.Supp. 353 (S.D. Iowa 1972). Nevertheless, in the absence of direct conflict of medical testimony the attending physician's testimony is still entitled to great weight. *Ridgely, supra,* 345 F.Supp. at 991.

The testimony of the Medical Advisor, while supportive of the Appeals Council's decision, is, in the Court's opinion, speculative. The Hearing Examiner's summary of the testimony, which the Court here adopts, includes the following:

The Hearing Examiner then asked him to ignore the diagnosis and to give his opinion as to whether she did in fact receive medical care during the period involved which must be furnished by or under the continuing supervision of trained medical personnel to assure the safety of the patient and achieve the medically desired result.

He answered that some of the care that she did receive was by trained medical personnel but that it was not necessary that this be the case. He stated that she received intramuscular injections about once a week and noted that this could have been done by some doctor visiting her home. He also pointed out that she received physical therapy treatment by trained medical personnel but that this same type of physical therapy could have been done by non-medical personnel by applying hot packs, hot water, etc., in a home situation.

The medical advisor was then asked by the Hearing Examiner whether, in his opinion, the care Miss Harris did receive could have safely and adequately been self-administered or performed by the average non-medical person without the direct supervision of trained medical personnel.

He replied that in his opinion she could have administered some of the care and some of the therapy would have necessarily had to have been done by some other person who cared for her and wanted her to be rehabilitated but this person did not need to be trained medical personnel.

The medical advisor was then questioned by Mr. Temple and in particular was asked whether he was familiar with the fact that there was only one doctor in Wakefield, where the claimant resided, and limited medical personnel in Sussex County. He replied that he was familiar with Sussex County but he felt like Dr. Kaufman at Wakefield could have called on the claimant once a week, as the file indicated that Dr. Cohen had done while she was in the nursing home. [Tr. 37]

The gravamen of this testimony, that the treatment by trained personnel which Miss Harris received could have been performed by untrained persons, is in the Court's opinion outweighed by other medical testimony which stresses the need for close observation.

The Court is prompted to its conclusion by a second factor. The Appeals Council has seemingly taken a very broad view of the "custodial care" exception, apparently interpreting same to include all care which need not necessarily be administered by trained personnel.[4] This interpretation has been previously criticized by several other district courts which have dealt with the matter. See, e. g., Sowell v. Richardson, 319 F.Supp. 689 (D.S.C.1970); Ridgely v. Secretary of H.E.W., supra, 345 F.Supp. 983, aff'd 475 F.2d 1222 (4 Cir. 1973). In Sowell, Judge Hemphill took a narrower view of the "custodial care" exception:

. . . Neither the courts nor the Secretary should, in the interest [of] minimizing costs so interpret the provisions of the Act as to frustrate its purpose. A sensible nontechnical approach to interpretation of this chapter is necessary in order to give effect to the purposes of the Act and to afford equitable treatment to those seeking its benefits. . . .

The position taken by the Secretary is not in accord with these principles. Under his formula for determining whether the services are covered only the service actually rendered is consid-

4. If this interpretation is in the nature of a conclusion of law, it is subject to broader review than are mere factual findings. *Ridgely, supra,* 345 F.Supp. 983.

ered. The condition of the insured and manifest symptoms of the illness are in his view only relevant to the extent that they determine the treatment administered. Were the law as contended by the Secretary, consideration of the trees is commanded but even a glimpse of the forest prohibited. It was never intended by Congress that the condition of the insured, treatment that might at any time be necessary, and the pain and discomfort attending inadequate or unprofessional care or lack of care not be considered together with treatment actually provided in determining whether extended care services are justified. Every aspect of the plaintiff's physical condition must be considered in making the determination. Treatments immediately required are of course a major factor. However, even if no treatment were required the condition of the insured might be so unstable or unsatisfactory, as to require the extended services contemplated by the statute. 319 F.Supp. 689, 691–692.

Chief Judge Northrop sensibly added in *Ridgely, supra:*

Indeed, it appears to this Court that the purpose of the custodial care disqualification in § 1395y(a)(9) was not to disentitle old, chronically ill and basically helpless, bewildered and confused people like Mrs. Hape from the broad remedy which Congress intended to provide for our senior citizens. Rather, the provision was intended to stop cold-blooded and thoughtless relatives from relegating an oldster who could care for him or herself to the care of an ECF merely so that that oldster would have a place to eat, sleep, or watch television. But when a person is sick, especially a helpless old person, and when those who love that person are not skilled enough to take care of that person, Congress has provided a remedy in the Medicare

Act, and that remedy should not be eclipsed by an application of the law and findings of fact which are blinded by bureaucratic economics to the purpose of the Congress.

This Court concurs with the above stated reasoning and concludes here that the "custodial care" exception was erroneously applied to Miss. Harris.[5]

For the reasons assigned, therefore, summary judgment will be denied to the defendant and awarded to the plaintiff.

An appropriate order shall issue.

---

5. The Court withholds ruling on the collateral issue of whether or not the Secretary's noncompliance with his own notification procedures by virtue of the late notice given Mr. Temple estops the Secretary from denying benefits.