**Sophie GARTMANN, Plaintiff,**

v.

**SECRETARY OF the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.**

No. CV 84–2638.

United States District Court, E.D. New York.

April 28, 1986.

Robert & Schneider by Ira S. Schneider and Steven P. Lerner, Hempstead, N.Y., for plaintiff.

Reena Raggi, U.S. Atty. by Thomas Roberts, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Sophie Gartmann ("Gartmann") brings this action under §§ 205(g) and 1869(b) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g) and 1395ff, for review of a determination of the Secretary of Health and Human Services ("Secretary") which denied plaintiff's application for payment of post-hospital extended care services benefits under Title XVIII of the Act, 42 U.S.C. §§ 1395–1395zz. Specifically, plaintiff seeks reversal of the Secretary's determination that Gartmann is not eligible for reimbursement for services rendered at the Cliffside Nursing Home for a one hundred day period beginning July 23, 1982. The parties have now cross-moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).

### I.

Before the Court turns to the specific facts of this case, it will perhaps be useful to outline briefly the statutory and regulatory scheme that underlies plaintiff's claim. In 1965, Congress added a new Title XVIII to the Social Security Act for the specific purpose of providing a coordinated and comprehensive approach to health insurance and medical care to the aged. 1965 U.S.Code Cong. and Ad.News 1943; *Turecamo v. C.I.R.*, 554 F.2d 564, 571 (2d Cir. 1977). Given the heading "Health Insurance for Aged and Disabled," Title XVIII is more commonly known as the Medicare statute. In relevant part, the Medicare statute provides for reimbursable hospital and skilled nursing facility insurance benefits. 42 U.S.C. §§ 1395–1395i–2 ("Medicare Part A"). The statute establishes a number of specific categories of services for which reimbursement may, under appropriate circumstances, be mandated, namely, inpatient hospital services, post-hospital extended care services, home health services, and, "in lieu of certain other benefits," hospice care. 42 U.S.C. § 1395d(a).

Plaintiff in the case at bar seeks benefits for post-hospital extended care services. Part C of the Medicare statute sets forth definitions of both "extended care services" and "post-hospital extended care services." 42 U.S.C. § 1395x(h) provides:

The term "extended care services" means the following items and services furnished to an inpatient of a skilled

nursing facility and (except as provided in paragraphs (3) and (6)) by such skilled nursing facility—

(1) nursing care provided by or under the supervision of a registered professional nurse;

(2) bed and board in connection with the furnishing of such nursing care;

(3) physical, occupational, or speech therapy furnished by the skilled nursing facility or by others under arrangements with them made by the facility;

(4) medical social services;

(5) such drugs, biologicals, supplies, appliances, and equipment, furnished for use in the skilled nursing facility, as are ordinarily furnished by such facility for the care and treatment of inpatients;

(6) medical services provided by an intern or resident-in-training of a hospital with which the facility has in effect a transfer agreement (meeting the requirements of subsection (*l*) of this section), under a teaching program of such hospital approved as provided in the last sentence of subsection (b) of this section, and other diagnostic or therapeutic services provided by a hospital with which the facility has such an agreement in effect; and

(7) such other services necessary to the health of the patients as are generally provided by skilled nursing facilities;

excluding, however, any item or service if it would not be included under subsection (b) of this section if furnished to an inpatient of a hospital.

42 U.S.C. § 1395x(i) states:

1. "Skilled nursing facility" ("SNF") is defined in § 1395x(j). The parties do not appear to contest that the facility at which plaintiff was cared for falls within the definition established by the statute.

2. 42 U.S.C. § 1395hh grants the Secretary the power to promulgate regulations necessary to carry out the administration of the Medicare program. 42 C.F.R. §§ 409.30–.36 further define the requirements of post-hospital extended care covered by the Act. The regulations provide, in part:

The term "post-hospital extended care services" means extended care services furnished an individual after transfer from a hospital in which he was an inpatient for not less than 3 consecutive days before his discharge from the hospital in connection with such transfer. For purposes of the preceding sentence, items and services shall be deemed to have been furnished to an individual after transfer from a hospital, and he shall be deemed to have been an inpatient in the hospital immediately before transfer therefrom, if he is admitted to the skilled nursing facility (A) within 30 days after discharge from such hospital, or (B) within such time as it would be medically appropriate to begin an active course of treatment, in the case of an individual whose condition is such that skilled nursing facility care would not be medically appropriate within 30 days after discharge from a hospital; and an individual shall be deemed not to have been discharged from a skilled nursing facility if, within 30 days after discharge therefrom, he is admitted to such facility or any other skilled nursing facility.[1]

Any expenses incurred for items or services which are not "reasonable and necessary" for diagnosis or treatment are specifically excluded from coverage under the Act, as are expenses for "custodial care". 42 U.S.C. §§ 1395y(a)(1)(A) and (9). Custodial care is defined in the regulations promulgated under Title XVIII as "any care which does not meet the definition of extended care." 42 C.F.R. § 405.310(g).[2]

REQUIREMENTS FOR COVERAGE OF POST-HOSPITAL SNF CARE
§ 409.30 Basic requirements.
Posthospital SNF care, including SNF-type care furnished in a hospital that has a swing-bed approval, is covered only if the beneficiary meets the requirements of this section and only for days when he or she needs and receives care of the level described in § 409.-31.
(a) Pre-admission requirements. The beneficiary must—
(1) Have been hospitalized in a participating or qualified hospital, for medically necessary inpatient hospital care, for at least 3

consecutive calendar days, not counting the day of discharge; and

(2) Have been discharged from the hospital in a month for which he or she was entitled to hospital insurance benefits, in accordance with Part 408 of this chapter.

. . . .

§ 409.31  Level of care requirement.

(a) *Definition.* As used in this section, "skilled nursing and skilled rehabilitation services" means services that:

(1) Are ordered by a physician;

(2) Require the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists; and

(3) Are furnished directly by, or under the supervision of, such personnel.

(b) *Specific conditions for meeting level of care requirements.* (1) The beneficiary must require skilled nursing or skilled rehabilitation services, or both, on a daily basis.

(2) Those services must be furnished for a condition—

(i) For which the beneficiary received inpatient hospital services; or

(ii) Which arose while the beneficiary was receiving care in a SNF or swing-bed hospital for a condition for which he or she received inpatient hospital services.

(3) The daily skilled services must be ones that, as a practical matter, can only be provided in a SNF, on an inpatient basis.

§ 409.32  Criteria for skilled services and the need for skilled services.

(a) The service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel.

(b) A condition that does not ordinarily require skilled services may require them because of special medical complications. Under those circumstances, a service that is usually non-skilled (such as those listed in § 409.33(d)) may be considered skilled because it must be performed or supervised by skilled nursing or rehabilitation personnel. . . .

(c) The restoration potential of a patient is not the deciding factor in determining whether skilled services are needed. Even if full recovery or medical improvement is not possible, a patient may need skilled services to prevent further deterioration or preserve current capabilities. . . .

§ 409.33  Examples of skilled nursing and rehabilitation services.

(a) *Services that could qualify as either skilled nursing or skilled rehabilitation services* —(1) *Overall management and evaluation of care plan.* The development, management, and evaluation of a patient care plan based on the physician's orders constitute skilled services when, because of the patient's physical or mental condition, those activities require the involvement of technical or professional personnel in order to meet the patient's needs, promote recovery, and ensure medical safety. This would include the management of a plan involving a variety of personal care services when, in light of the patient's condition, the aggregate of those services requires the involvement of technical or professional personnel. For example, an aged patient with a history of diabetes mellitus and angina pectoris who is recovering from an open reduction of a fracture of the neck of the femur requires, among other services, careful skin care, appropriate oral medications, a diabetic diet, an exercise program to preserve muscle tone and body condition, and observation to detect signs of deterioration in his or her condition or complications resulting from restricted, but increasing, mobility. Although any of the required services could be performed by a properly instructed person, such a person would not have the ability to understand the relationship between the services and evaluate the ultimate effect of one service or the other. Since the nature of the patient's condition, age, and immobility create a high potential for serious complications, such an understanding is essential to ensure the patient's recovery and safety. Under these circumstances, the management of the plan of care would require the skills of a nurse even though the individual services are not skilled. Skilled planning and management activities are not always specifically identified in the patient's clinical record. Therefore, if the patient's overall condition would support a finding that recovery and safety can be assured only if the total care is planned, managed, and evaluated by technical or professional personnel, it would be appropriate to infer that skilled services are being provided.

. . . .

(b) *Services that qualify as skilled nursing services.* (1) Intravenous, intramuscular, or subcutaneous injections and hypodermoclysis or intravenous feeding;

(2) Levin tube and gastrostomy feedings;

(3) Nasopharyngeal and tracheostomy aspiration;

(4) Insertion and sterile irrigation and replacement of catheters;

(5) Application of dressings involving prescription medications and aseptic techniques;

(6) Treatment of extensive decubitus ulcers or other widespread skin disorders;

(7) Heat treatments which have been specifically ordered by a physician as part of active treatment and which require observation by nurses to adequately evaluate the patient's progress;

(8) Initial phases of a regimen involving administration of medical gases;

(9) Rehabilitation nursing procedures, including the related teaching and adaptive aspects of nursing, that are part of active treat-

The costs of post-hospital extended care services are reimbursable only if a physician certifies that such services "are or were required to be given because the individual needs or needed on a daily basis skilled nursing care.... or other skilled rehabilitation services, which as a practical matter can only be provided in a skilled nursing facility on an inpatient basis." 42 U.S.C. § 1395f(a)(2)(C).

Furthermore, the Act requires that each participating state establish "utilization review committees" ("URC's") to assure that patients will receive neither a greater nor

ment, e.g., the institution and supervision of bowel and bladder training programs.

(c) *Services which would qualify as skilled rehabilitation services.* (1) Ongoing assessment of rehabilitation needs and potential: Services concurrent with the management of a patient care plan, including tests and measurements of range of motion, strength, balance, coordination, endurance, functional ability, activities of daily living, perceptual deficits, speech and language or hearing disorders;

(2) Therapeutic exercises or activities: Therapeutic exercises or activities which, because of the type of exercises employed or the condition of the patient, must be performed by or under the supervision of a qualified physical therapist or occupational therapist to ensure the safety of the patient and the effectiveness of the treatment;

(3) Gait evaluation and training: Gait evaluation and training furnished to restore function in a patient whose ability to walk has been impaired by neurological, muscular, or skeletal abnormality;

(4) Range of motion exercises: Range of motion exercises which are part of the active treatment of a specific disease state which has resulted in a loss of, or restriction of, mobility as evidenced by a therapist's notes showing the degree of motion lost and the degree to be restored;

(5) Maintenance therapy: Maintenance therapy, when the specialized therapist is required to design and establish a maintenance program based on an initial evaluation and periodic reassessment of the patient's needs, and consistent with the patient's capacity and tolerance. For example, a patient with Parkinson's disease who has not been under a rehabilitation regimen may require the services of a qualified therapist to determine what type of exercises will contribute the most to the maintenance of his present level of functioning.

(6) Ultrasound, short-wave, and microwave therapy treatment by a qualified physical therapist;

(7) Hot pack, hydrocollator, infrared treatments, paraffin baths, and whirlpool: Hot pack, hydrocollator, infrared treatments, paraffin baths, and whirlpool in particular cases where the patient's condition is complicated by circulatory deficiency, areas of desensitization, open wounds, fractures, or other complications, and the skills, knowledge, and judg-

ment of a qualified physical therapist are required; and

(8) Services of a speech pathologist or audiologist when necessary for the restoration of function in speech or hearing.

(d) *Personal care services.* Personal care services which do not require the skills of qualified technical or professional personnel are not skilled services except under the circumstances specified in § 409.32(b). Personal care services include, but are not limited to, the following:

(1) Administration of routine oral medications, eyedrops, and ointments;

(2) General maintenance care of colostomy and ileostomy;

(3) Routine services to maintain satisfactory functioning of indwelling bladder catheters;

(4) Changes of dressings for noninfected postoperative or chronic conditions;

(5) Prophylactic and palliative skin care, including bathing and application of creams, or treatment of minor skin problems;

(6) Routine care of the incontinent patient, including use of diapers and protective sheets;

(7) General maintenance care in connection with a plaster cast;

(8) Routine care in connection with braces and similar devices;

(9) Use of heat as a palliative and comfort measure, such as whirlpool and hydrocollator;

(10) Routine administration of medical gases after a regimen of therapy has been established;

(11) Assistance in dressing, eating, and going to the toilet;

(12) Periodic turning and positioning in bed; and

(13) General supervision of exercises which have been taught to the patient; including the actual carrying out of maintenance programs, i.e., the performance of the repetitive exercises required to maintain function do not require the skills of a therapist and would not constitute skilled rehabilitation services (see paragraph (c) of this section). Similarly, repetitious exercises to improve gait, maintain strength, or endurance; passive exercises to maintain range of motion in paralyzed extremities, which are not related to a specific loss of function; and assistive walking do not constitute skilled rehabilitation services.
....

lesser level of care than they need. 42 U.S.C. § 1395x(k); 42 C.F.R. § 405.1137; *Kuebler v. Secretary of the United States Dep't of Health and Human Services,* 579 F.Supp. 1436, 1440 (E.D.N.Y.1984). Such committees must include at least two physicians, and may also include other professional personnel such as registered nurses or medical social workers. 42 U.S.C. § 1395x(k); 42 C.F.R. § 405.1137; 1965 U.S.Cong.Code and Ad.News 1943, 1988. An attending physician may not be a member of a URC that is conducting a review of his patient's care. 42 C.F.R. § 405.-1137(b)(3); *Kraemer v. Heckler,* 737 F.2d 214, 216 (2d Cir.1984). The Senate Report on the Medicare statute states, "Hospitals and extended care facilities participating in the program would be required to have in effect a utilization review plan providing for a review of admissions to the institution, lengths of stays, and the medical necessity for services provided with the objective of promoting the efficient use of services and facilities." 1965 U.S.Cong.Code and Ad.News 1943, 1988. Post-hospital extended care services Medicare benefits are available only if a URC determines that such services are medically necessary. 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 405.1137. Before a URC can find that further services are not necessary, it must afford a patient's attending physician an opportunity for consultation with the committee. 42 U.S.C. § 1395x(k)(4); 42 C.F.R. § 405.1137; *Hultzman v. Weinberger,* 495 F.2d 1276 (3d Cir.1974).

If an individual meets all of the above requirements, Medicare will cover post-hospital extended care services "for up to 100 days during any spell of illness." 42 U.S.C. § 1395d(a)(2)(A).[3] It is reimbursement for services rendered by the Cliffside Nursing Home during such a one hundred day period that Gartmann seeks in this lawsuit.

## II.

Plaintiff is an 87 year old woman who was born October 25, 1898. On July 14, 1982, she was admitted to Hillcrest General Hospital, where congestive heart failure, a left cerebral vascular accident, aphasia, and hypertension were diagnosed.

On July 23, 1982, plaintiff was transferred to the Cliffside Nursing Home ("Cliffside"), a skilled nursing facility.[4] The patient transfer form indicates that at the time of her transfer Gartmann was suffering from a cerebral vascular accident, right hemiplegia, and aphasia, required a low salt diet and help feeding herself, and needed "total care," which included complete assistance in toileting, bathing and dressing. Her behavior was withdrawn and her mental status forgetful and confused. Plaintiff lacked any communicative ability, as she could not speak or write, and could not understand speaking, writing or gestures. Furthermore, upon her transfer to Cliffside, Gartmann exhibited a sudden onset of dyspnea and a rapid ventricular rate. In his progress notes, Dr. Kreitman, plaintiff's attending physician, stated that on the date of her admission to the nursing home, plaintiff's ailments included congestive heart failure, atrial fibrillation, pulmonary infiltrate, and urinary tract infection.

Upon Gartmann's admission to Cliffside, Dr. Kreitman certified that post-hospital extended care facility services were required because of Gartmann's need for skilled nursing care on a continuing basis for the conditions for which she had been receiving in-patient hospital services at Hillcrest General Hospital. Dr. Kreitman recertified that extended care was necessary on August 6, 1982, noting the need for

---

**3.** 42 U.S.C. § 1395x(a) defines "spell of illness:" The term "spell of illness" with respect to any individual means a period of consecutive days—

(1) beginning with the first day (not included in a previous spell of illness) (A) on which such individual is furnished inpatient hospital services or extended care services, and (B)

which occurs in a month for which he is entitled to benefits under part A, and

(2) ending with the close of the first period of 60 consecutive days thereafter on each of which he is neither an inpatient of a hospital nor an inpatient of a skilled nursing facility.

**4.** *See supra* note 1.

treatment of right hemiplegia, cerebral vascular accident, and atrial fibrillation. On September 5, 1982, and again on October 5, 1982, Dr. Kreitman certified that continued extended care was necessary for rehabilitation post cerebral vascular accident.[5]

The record contains a number of pages of nurses' notes covering the period between July 23, 1982 and August 29, 1982. These notes indicate, *inter alia*, that Gartmann was unable to make her needs known due to her aphasia, and was incontinent of both urine and feces. Plaintiff required assistance in all activities of daily living, and attempts at toilet training proved unsuccessful. Her right leg and hand were paralyzed and, after plaintiff was found attempting to climb out of her wheelchair, a doctor[6] had recommended that she be restrained in her chair for her own safety. Plaintiff's bedrest position was changed every two hours to prevent pressure sores and breakdown of her skin. Each shift administered skin care to all of Gartmann's bony prominences and an excoriation the size of a silver dollar on the sacral area of her right buttocks was treated with Neosporin powder twice per day in an attempt to prevent further breakdown and irritation. Ampicillin was prescribed for plaintiff's congestion and coughing. In an attempt to prevent contracture, nurses performed motion exercises on all extremities and kept Gartmann's paralyzed leg and hand in good alignment. Plaintiff's shoulder tended to dislocate, necessitating the administration of a sling for support. Podiatry care was required for diagnosed arteriosclerosis obliterans.

A URC evaluated plaintiff on August 5, 1982 and September 9, 1982.[7] Both evaluations concluded, based on assessments completed July 27, 1982 and September 9, 1982, respectively, that the written orders of the attending physician and plan of care documented that the nursing and therapy that were being provided were necessary, plaintiff could not, as a practical matter, be cared for on an outpatient or home care basis, and that she was medically qualified to be covered by SNF care and should not be considered for another level of care. In describing the patient's condition requiring skilled nursing supervision, the evaluations noted, in part, that plaintiff was aphasic and incontinent and was unable to make her needs known. Plaintiff's medical assessment predictor score on each of the evaluations was 458.[8]

On August 25, 1982, defendant issued a Notice of Medicare Claim Determination informing plaintiff that the services rendered at Cliffside were not covered by Medicare. Plaintiff requested reconsideration and, on July 14, 1983, it was determined that the initial decision was correct. Plaintiff then requested a hearing, which was held on January 23, 1984 before an Administrative Law Judge who considered the case *de novo*.

In a decision dated January 31, 1984, the ALJ found that the services rendered by Cliffside were "supportive and custodial in nature and did not require the presence of skilled personnel." Accordingly, the ALJ held that the services were excluded from coverage under the Act.

The ALJ placed primary reliance for his decision on the testimony of Dr. Nathaniel

---

**5.** In a December 10, 1982 certification, Dr. Kreitman specified that SNF in-patient care was necessary because of ailments including cerebral vascular accident, aphasia, atrial fibrillation, and congestive heart failure, and noted that an indefinite period of continued SNF care would be required. Dr. Kreitman again certified the indefinite continued need for SNF care on February 8, 1983 and specified that "total care" was necessary due to "multiple" medical problems. Dr. Kreitman once again recertified the need for SNF care on April 12, 1983. These three additional recertifications, while perhaps relevant as evidence that plaintiff required a

lengthy period of post-hospital extended care services, dated, of course, beyond the reimbursable one hundred day period.

**6.** The doctor's name is not legible in the notes.

**7.** The URC also evaluated Gartmann on July 8, 1982, prior to the one hundred day period for which plaintiff seeks reimbursement.

**8.** A score of 180 or greater indicates the need for skilled nursing care. 10 N.Y.C.R.R. 415.-1(a)(2). *See also* Record at 124, 131.

Reich, a medical advisor for the Social Security Administration who was present at the hearing at the request of the ALJ. Dr. Reich testified as a physician who had reviewed the evidence of record but had never actually examined or professionally treated Gartmann. Based on this review, Dr. Reich concluded that plaintiff's physical condition was such that she did not require skilled nursing care but could adequately have been cared for at a lower level of care than that provided by an SNF. Dr. Reich also opined that the drugs which plaintiff received did not have to be administered by skilled personnel. Similarly, the periodic turning of plaintiff's body to reduce the possibility of ulceration could have been done by unskilled individuals.

The ALJ determined that the certification by the URC was "of little probative value" because it was not signed by a doctor,[9] and did not discuss the relevance of Dr. Kreitman's certifications. The ALJ stated, "[T]he medical advisor is the best individual to evaluate the medical evidence because the medical evidence needs a skilled and impartial advisor to determine the level of care."

The ALJ's ruling that Gartmann is not entitled to reimbursement became the final decision of the Secretary when the Appeals Council denied review in a decision dated May 3, 1984. Plaintiff then filed suit in this Court pursuant to 42 U.S.C. §§ 405(g) and 1395ff.

### III.

#### A.

■ Courts have developed a number of principles which govern judicial review of final determinations of the Secretary regarding entitlement to benefits under the Act. First, the proper legal standard for determining the need for skilled nursing care involves consideration of the patient's condition as a whole, rather than an analysis of the specific services provided. *E.g.,*

*Kellerman v. Heckler,* No. CV 85–3823 (S.D.N.Y. March 11, 1986) [Available on WESTLAW, DCTU database]; *Kuebler,* 579 F.Supp. at 1438; *Klofta v. Mathews,* 418 F.Supp. 1139, 1142–44 (E.D.Wis.1976); *Ridgely v. Secretary of the Dep't of Health, Education and Welfare,* 345 F.Supp. 983, 989 (D.Md.1972), *aff'd,* 475 F.2d 1222 (4th Cir.1973). In assessing the patient's condition, a court is to use a common sense, non-technical approach. *Howard v. Heckler,* 618 F.Supp. 1333, 1335 (E.D.N.Y.1985). Second, the remedial purpose of the Act requires that it be broadly construed. *E.g., Coe v. Secretary of Health, Education and Welfare,* 502 F.2d 1337, 1340 (4th Cir.1974); *Howard,* 618 F.Supp. at 1335; *Ridgely,* 345 F.Supp. at 993. Care must be taken "not to disentitle old, chronically ill and basically helpless, bewildered and confused people ... from the broad remedy which Congress intended to provide our senior citizens." *Ridgely,* 345 F.Supp. at 993.

■ A final determination by the Secretary as to an individual's entitlement to benefits is generally conclusive if supported by substantial evidence on the record as a whole. 42 U.S.C. §§ 405(g) and 1395ff; *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir.1978); *Fineberg v. Secretary of Health, Education and Welfare,* 363 F.Supp. 1382 (W.D.N.Y.1973). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). A reviewing court, therefore, is compelled to accept the Secretary's supported findings of fact. A court, however, is not bound by the Secretary's conclusions or interpretations of law, or an application of an incorrect legal standard. *E.g., Kuebler,* 579 F.Supp. at 1438; *Sokoloff v. Richardson,* 383 F.Supp. 234, 236 (E.D.N.Y.1973); *Ridgely,* 345 F.Supp. at

---

9. The ALJ also dismissed the worth of the URC evaluation because "it did not concern the time period at issue." Apparently, the ALJ failed to observe that the record contained three separate URC reports, of which only the earliest was prepared outside the period at issue in the case. *See supra* note 7 and accompanying test.

988. As one court noted, "Before the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards." *Klofta,* 418 F.Supp. at 1141.

### B.

Applying these principles to the case at bar, it is clear that the Secretary's denial of reimbursement cannot withstand scrutiny. The ALJ found that the services which Gartmann received were supportive, custodial, and did not require the presence of skilled personnel, and held that plaintiff was therefore not entitled to Medicare benefits. The ALJ noted some of Gartmann's physical ailments, but focused his analysis not on plaintiff's condition but on the specific services provided her.

The various services rendered plaintiff at Cliffside may very well have constituted "skilled" rather than "custodial" care under the Act and its accompanying regulations, notwithstanding the ALJ's conclusion and interpretation of the law. In any event, in resting his holding upon the nature of the specific services rendered plaintiff, the ALJ failed to apply the correct legal standard. During the period in question, plaintiff was an aphasic, confused woman in her mid eighties who was afflicted with, among other ailments, hemiplegia, congestive heart failure, and atrial fibrillation, had suffered a cerebral vascular accident, was incontinent and had a large excoriation on her buttocks, was completely unable to communicate or make her needs known, and required "total care." Considering plaintiff's condition as a whole, the Court finds that Gartmann indisputedly required skilled nursing care and services and therefore was entitled to Medicare coverage.

### C.

Even if the Court were to put to one side the Secretary's reliance on an improper legal standard in making a final determination that Gartmann should not be reimbursed under the Act, reversal of the Secretary's decision would still be required, for the record fails to contain the substantial evidence necessary to support the Secretary's conclusion. The ALJ rested his decision almost entirely on the testimony of Dr. Reich, a reviewing medical advisor who had never examined plaintiff, and failed even to mention the diagnoses and repeated certifications of needed skilled care made by Dr. Kreitman, plaintiff's treating physician. While the opinion of a medical advisor is admissible into evidence, *Richardson,* 401 U.S. at 402, 91 S.Ct. at 1428, and such an opinion may constitute substantial evidence if it is supported by the findings or opinions of an examining physician, *Rodriguez v. Secretary of Health and Human Services,* 647 F.2d 218, 223 (1st Cir.1981) (widow's benefits); *Kyle v. Cohen,* 449 F.2d 489, 491–92 (4th Cir.1971); or, a plaintiff's own testimony, *Warnke v. Harris,* 619 F.2d 412, 416, *rehearing denied,* 624 F.2d 1098 (5th Cir.1980), the record in the instant case contains no evidence sufficiently supportive of Dr. Reich's testimony as to raise his opinion to the level of substantial evidence requiring affirmance of the ALJ's ruling.

By contrast, Dr. Kreitman's conclusion that skilled nursing care was required is entitled to great weight. *See, e.g., Kuebler,* 579 F.Supp. at 1440; *Breeden v. Weinberger,* 377 F.Supp. 734, 737 (M.D.La.1974); *Ridgely,* 345 F.Supp. at 991–92. It is a well-settled rule in Social Security disability cases that the expert medical opinion of a patient's treating physician is to be accorded deference by the Secretary and is binding unless contradicted by substantial evidence. *E.g., Schisler v. Heckler,* 787 F.2d 76, 81 (2d Cir.1986); *Bluvband v. Heckler,* 730 F.2d 886, 893 (2d Cir.1984); *Eiden v. Secretary of Health, Education and Welfare,* 616 F.2d 63, 64 (2d Cir.1980). This rule may well apply with even greater force in the context of Medicare reimbursement. The legislative history of the Medicare statute makes clear the essential role of the attending physician in the statutory scheme: "The physician is to be the key figure in determining utiliza-

tion of health services." 1965 U.S.Code Cong. and Ad.News, 1943, 1986. *See also, e.g., Hultzman,* 495 F.2d at 1279; *Kuebler,* 579 F.Supp. at 1440; *Breeden,* 377 F.Supp. at 737; *Reading v. Richardson,* 339 F.Supp. 295, 300–01 (E.D.Mo.1972).

■ The ALJ's decision is further undermined by his rejection of the URC evaluations. His determination that the URC reports were "of little probative value" displays a complete lack of understanding of the importance the Medicare statute assigns such committees. The ALJ evinced the view that the reviewing physician, as a "skilled and impartial advisor," was the best individual to evaluate the medical evidence and determine the proper level of care. Under the Medicare provisions, however, this is precisely the purpose of the URC. The legislative history highlights Congress' intention that URC's, as organizations a step removed from the patient, attending physician, and Social Security Administration, perform a dual function. The Senate Report stresses that utilization review is to be carried out in a manner that avoids unnecessary medical costs without sacrificing the needs of the patients themselves. 1965 U.S.Code Cong. & Ad.News 1943, 1987–88. URC's, therefore, are designed to act as a control on governmental health care costs,[10] while at the same time ensuring that patients' rights are not trampled upon. This Court has previously recognized the value and persuasive nature of URC decisions. As the Court observed in *Kuebler:*

> These committees include independent physicians and are intended to ensure economical, efficient use of medical facilities and prevent unnecessary Medicare payments without substituting bureaucratic goals for medical judgment. *Hultzman v. Weinberger,* 495 F.2d at 1280–81. The Secretary has used the determinations of URC's in previous cases to support a denial of medical payments. *Hayner v. Weinberger,* [382

F.Supp. 762, 764 (E.D.N.Y.1974)]. The Secretary should not now be heard to preemptorily discount the findings and recommendations of the URC because they do not serve her purposes. *See, Hultzman v. Weinberger,* 495 F.2d at 1281.

579 F.Supp. at 1440.

Wilbur Cohen, Under-Secretary of the Department of Health, Education and Welfare at the time Congress was considering the Medicare legislation, went even further in his evaluation of the effect of URC determinations upon the Secretary. In executive hearings before the House Ways and Means Committee, Cohen testified, "If the [utilization] review board makes a mistake, there is nothing we can do about it." In response to questioning, Cohen agreed that a URC's decision would be equivalent to a "supreme court decision." Executive Hearings on H.R. 1 Before the House Comm. on Ways and Means, 89th Cong., 1st Sess., at 68 (1965), *quoted in Hultzman,* 495 F.2d at 1280.

■ Additionally, the ALJ's argument that in Gartmann's particular case the probative value of the URC reports is negated by the fact that they were not signed by a doctor is not justified. It is true that "H. Friedman," a registered nurse, signed the evaluation forms. Friedman, however, was a member of the URC and, under the Secretary's own regulations, professional personnel besides physicians may properly be members of URCs and may screen cases using criteria established by physician members of the committee. 42 C.F.R. §§ 405.1137(b)(1) and (d)(2).

■ The Secretary's denial of reimbursement, therefore, is not supported by substantial evidence. Dr. Reich's testimony, in and of itself, is not sufficient to bind the Court to the ALJ's conclusions. Furthermore, the Court holds that, at least absent a showing by the Secretary that in a given case the statutory system requiring

---

10. Government pays for over half of the costs of nursing home care. *Rx for the Elderly: Legal Rights (and Wrongs) Within the Health Care*

*System,* 20 Harv.Civ.Rt.-Civ.Lib.L.Rev. 425, 466 (1985).

dual certification by an attending physician and a URC has broken down, where both an attending physician and a URC certify that an individual requires post-hospital extended care services, these determinations shall be binding upon the Secretary.

### IV.

For the reasons stated above, the Court concludes that Gartmann is eligible for reimbursement for services rendered at the Cliffside Nursing Home for a one hundred day period beginning July 23, 1982. Accordingly, the Court hereby orders that plaintiff's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is granted and defendant's motion for judgment under Rule 12(c) is denied. The Clerk of the Court is directed to enter judgment in favor of plaintiff, reversing the Secretary's determination and awarding reimbursement for post-hospital extended care services provided by the Cliffside Nursing Home for the one hundred day period commencing July 23, 1982.

SO ORDERED.