**Donald PFALZGRAF, Co–Executor of the Estate of Mary Pfalzgraf, Plaintiff,**

v.

**Donna SHALALA, Secretary of the United States Department of Health and Human Services, Defendant.**

**No. 97–CV–124H.**

United States District Court,
W.D. New York.

Jan. 30, 1998.

Anthony Szczygiel, Buffalo, NY, for Plaintiff.

Denise E. O'Donnell, United States Attorney, Jane B. Wolfe, Assistant United States Attorney, of counsel, Buffalo, NY, for Defendant.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this case, including entry of judgment. Plaintiff initiated this action pursuant to 42 U.S.C. § 405(g) to seek review of the final decision of the Secretary of Health and Human Services (the "Secretary") denying payment under Medicare Part A, 42 U.S.C. § 1395 *et seq.*, and the Secretary has moved for judgment on the pleadings pursuant to Fed. R.Civ.P. 12(c). For the following reasons, the Secretary's motion is denied and the case is remanded for calculation of benefits.

## BACKGROUND

Plaintiff brought this action on behalf of his mother, Mary Pfalzgraf, who died on April 3, 1992. On March 28, 1991, Mrs. Pfalzgraf was admitted to Lake Shore Hospital. She was 86 years old at the time. She had become unresponsive at home, and was not eating or drinking. Her diagnosis upon admission to the hospital was ketoacidosis secondary to dehydration, hyperosmolar acidosis, diabetes mellitus, senile dementia, urosepsis, rheumatoid arthritis, arteriosclerotic cardiovascular disease, Klebsiell pneumonia, multiple decubital changes in the buttocks and sacral area, and incontinence (T. 93).[1] She responded positively to intravenous hydration and medication, and was gradually put on oral medications. However, as noted by Dr. Russell Joy in his discharge summary, Mrs. Pfalzgraf "was unable to return home to her former status, and long-term placement was indicated" (id.); see also Report of treating physician Dr. George Groff ("Her general poor health, skin breakdown, and so on suggested she is in need of Social Services evaluation and that perhaps the family is not able to care for her appropriately at home") (T. 92).

On April 22, 1991, Mrs. Pfalzgraf was discharged to the Park Shore Health Care Center, a skilled nursing facility ("SNF") (id.). Upon admission to Park Shore, Mrs. Pfalzgraf was alert and oriented to self, but orientation to time and place was "difficult to assess" due to her limited verbalization (T. 110). Communication was limited to grunts and one-syllable words (T. 207). She had a Stage II decubitus ulcer on her left hip (T. 89). She weighed sixty-nine pounds (id.). She was incontinent of bladder and bowel, and required total care of activities of daily living ("ADL's") (T. 90).

On April 22, 1991, Dr. Nestor Cifuentes, Park Shore's medical director, examined Mrs. Pfalzgraf. He summarized her condition as "deteriorating" as a result of "dementia, arthritis 4 [four] extremities, stiffness, diabetes" (T. 134). Her prognosis was poor. He noted her long history of chronic diseases, and that she was "getting worse progressively" (T. 133). He recommenced "medical care as needed" (id.). A "Physician's Order Data Record" dated April 22, 1991, signed by Dr. Cifuentes, indicated that Mrs. Pfalzgraf required a "skilled" level of care (T. 118).

On April 25, 1991, plaintiff was notified by Park Shore that Mrs. Pfalzgraf's care would not be covered by Medicare (T. 135). As stated in the "Skilled Nursing Facility (SNF) Determination on Admission," dated April 24, 1991:

Medicare covers medically necessary skilled nursing care needed on a daily basis. You only needed oral medications, assistance with your daily activities and general supporting services. There is no evidence of medical complications or other medical reasons that required the skills of a professional nurse or therapist to safely and effectively carry out your plan of care. Therefore, we believe your care cannot be covered under Medicare.

(Id.).

On October 29, 1993,[2] Gail Lavezzari, R.N., from Medicare Part A sent plaintiff a letter in which she stated as follows:

A review of the medical records shows that the overall aggregate of services rendered the beneficiary does not reveal the need for daily inpatient skilled nursing care. The services received were primarily designed to assist in meeting the activities of daily living. Under the law, Medicare does not cover custodial care. Care is

---

**1.** References preceded by "T" are to page numbers of the transcript of the administrative record, filed by defendant as part of the answer to the complaint.

**2.** As reflected by the administrative record in this case, on September 10, 1991, Medicare notified Mrs. Pfalzgraf that despite the adverse determination by Park Shore, Mrs. Pfalzgraf was not liable for payment for services rendered from April 22, 1991 through May 31, 1991 because she

"neither knew nor had reason to know that services received were not covered under Medicare" (T. 165). Park Shore's request for reconsideration of this determination was initially denied as untimely filed. However, on May 26, 1993, ALJ Nicholas Haragos found that Park Shore was entitled to reconsideration, and the case was returned to Medicare for further action (T. 144–49). The October 29, 1993 determination followed.

considered custodial when it is primarily for the purpose of meeting personal needs and could be provided by persons without professional skills or training. For example, custodial care includes help in walking, getting in and out of bed, bathing and dressing, eating, and taking medicine. Even if a person is in a participating nursing facility, Medicare does not cover care if it is mainly custodial.

(T. 136). The letter informed plaintiff that Medicare did not cover any of the services provided to Mrs. Pfalzgraf at Park Shore during the period from April 22, 1991 through May 31, 1991 (T. 137).

Plaintiff requested a hearing to review this determination. On June 28, 1994, a hearing was held before Administrative Law Judge ("ALJ") Charles J. Fiorella (T. 239–62). Plaintiff did not appear at the hearing, and his presence was deemed waived.[3] On August 3, 1994, ALJ Fiorella found that the services provided to Mrs. Pfalzgraf by Park Shore were "entirely custodial in nature," and were therefore not covered by Medicare (T. 74).

On December 30, 1994, the Appeals Council remanded the case for further consideration, finding that the ALJ's determination "[did] not reflect consideration of the beneficiary's total condition and its relationship to the need for skilled services as required by 42 C.F.R. 409.33(a)" (T. 52). On August 16, 1995, a further hearing was held before ALJ Fiorella (T. 177–237). Plaintiff testified, and was represented by counsel.

On December 19, 1995, ALJ Fiorella again found that the services provided to Mrs. Pfalzgraf during the period at issue were "custodial in nature" (T. 14). ALJ Fiorella stated that he "considered the beneficiary's total condition during the period ... and [found] no evidence that her medical condition was such that she required skilled services" (id.).

On January 2, 1997, the Appeals Council issued a decision affirming the ALJ's determination (T. 4–7). The Appeals Council found that "overall management or assessment of care in this type of situation does not require the presence of skilled personnel on a daily basis" (T. 5).[4] The Appeals Council also found that Park Shore was liable for the care rendered between April 22, 1991 and April 25, 1991 (T. 5–6). On February 28, 1997, plaintiff filed this action seeking judicial review of the Appeals Council's determination (Item 1).

## DISCUSSION

### I. Standard of Review.

 The Secretary's Medicare Part A determinations are binding on the district court if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990); *Bergeron v. Shalala,* 855 F.Supp. 665, 666–67 (D.Vt.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

 However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards." *Klofta v. Mathews,* 418 F.Supp. 1139, 1141 (E.D.Wis.1976), *quoted in Gartmann v. Secretary of Health and Human Services,* 633 F.Supp. 671, 680 (E.D.N.Y.1986). While deference must be accorded the Secretary's supported findings of fact, this court is not bound by the Secretary's conclusions or interpretations of the law. *Gartmann, supra,* 633 F.Supp. at 679–80.

---

3. Correspondence in the administrative record suggests that there was a misunderstanding as to whether a request for an adjournment of the hearing had been granted (*see* T. 61–68).

4. The Appeals Council also found that Park Shore was liable for the care rendered between April 22, 1991 and April 25, 1991, since plaintiff did not receive notice of non-coverage until April 25, 1991 (T. 5–6). This part of the Appeals Council's determination is not being challenged here.

## II. "Skilled" Services/"Custodial" Services under Medicare Part A.

Medicare provides coverage for up to 100 days of "post-hospital extended care services" provided by a skilled nursing facility ("SNF"). 42 U.S.C. §§ 1395d(a)(2)(A), 1395x(h) and (i). Skilled nursing and skilled rehabilitative services provided by a SNF are those services that are "so inherently complex that [they] can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a); see also Falk v. Chater, 1995 WL 798915, at *3 (D.Conn.1995). Such services are usually ordered by a physician and are required on a daily basis for a condition for which the patient received inpatient hospital treatment. 42 C.F.R. § 409.31; see also 42 U.S.C. § 1395f(a)(2)(B). In addition, these services "must be ones that, as a practical matter, can only be provided in a SNF on an inpatient basis." 42 C.F.R. § 409.31(b)(3): see also 42 C.F.R. § 409.33.

The regulations also provide that "[a] condition that does not ordinarily require skilled services may require them because of special medical complications. Under those circumstances, a service that is usually non-skilled ... may be considered skilled because it must be performed or supervised by skilled nursing or rehabilitation personnel.... In situations of this type, the complications, and the skilled services they require, must be documented by physicians' orders and nursing or therapy notes." 42 C.F.R. § 409.32(b). Furthermore, as stated in 42 C.F.R. § 409.33(a)(1):

The development, management, and evaluation of a patient care plan based on the physician's orders constitute skilled services when, because of the patient's physical or mental condition, those activities require the involvement of technical or professional personnel in order to meet the patient's needs, promote recovery, and ensure medical safety. This would include[ ] the management of a plan involving only a variety of personal care services when, in light of the patient's condition, the aggregate of those services requires the involvement of technical or professional personnel. For example, an aged patient with a history of diabetes mellitus and angina pectoris who is recovering from an open reduction of a fracture of the neck of the femur requires, among other services, careful skin care, appropriate oral medications, a diabetic diet, an exercise program to preserve muscle tone and body condition, and observation to detect signs of deterioration in his or her condition or complications resulting from restricted, but increasing, mobility. Although any of the required services could be performed by a properly instructed person, such a person would not have the ability to understand the relationship between the services and evaluate the ultimate effect of one service on the other. Since the nature of the patient's condition, age, and immobility create a high potential for serious complications, such an understanding is essential to ensure the patient's recovery and safety. Under these circumstances, the management of the plan of care would require the skills of a nurse even though the individual services are not skilled. Skilled planning and management activities are not always specifically identified in the patient's clinical record. Therefore, if the patient's overall condition would support a finding that recovery and safety can be assured only if the total care is planned, managed, and evaluated by technical or professional personnel, it would be appropriate to infer that skilled services are being provided.

Medicare coverage is specifically excluded for "custodial care." 42 U.S.C. § 1395y(a)(9). Under the regulations, custodial care is described as "[p]ersonal care services which do not require the skills of qualified technical or professional personnel." 42 C.F.R. § 409.33(d). "The courts have interpreted custodial care to be care that can be provided by a lay person without special skills and not requiring or entailing the continued attention of trained or skilled personnel." Kuebler v. Secretary of Health and Human Services, 579 F.Supp. 1436, 1438 (E.D.N.Y.1984). Some examples of personal care services that would be considered custodial care under the regulations are: giving routine oral medications, routine services to maintain the satisfactory functioning of an indwelling bladder catheter, bathing, the application of creams

or other treatments for minor skin problems, routine care of an incontinent patient, and periodic turning or repositioning in bed. 42 C.F.R. § 409.33(d)(1), (3), (5), (6) and (12); *see Falk v. Chater, supra,* 1995 WL 798915, at *4.

 Under the law of the Second Circuit, judicial review of the agency's determination of a Medicare claimant's need for skilled nursing care as opposed to custodial care should be guided by two principles. "First, the decision should be based upon a common sense, non-technical consideration of the patient's condition as a whole. Second, the Social Security Act is to be liberally construed in favor of beneficiaries." *Friedman v. Secretary of Health and Human Services,* 819 F.2d 42, 45 (2d Cir.1987). As stated several years ago in *Ridgely v. Secretary of Health, Education and Welfare,* 345 F.Supp. 983 (D.Md.1972), *aff'd,* 475 F.2d 1222 (4th Cir.1973):

> [T]he purpose of the custodial care disqualification in § 1395y(a)(9) was not to disentitle old, chronically ill and basically helpless, bewildered and confused people . . . from the broad remedy which Congress intended to provide for our senior citizens. Rather, the provision was intended to stop cold-blooded and thoughtless relatives from relegating an oldster who could care for him or herself to the care of an [SNF] merely so that that oldster would have a place to eat, sleep, or watch television. But when a person is sick, especially a helpless old person, and when those who love that person are not skilled enough to take care of that person, Congress has provided a remedy in the Medicare Act, and that remedy should not be eclipsed by an application of the law and findings of fact which are blinded by bureaucratic economics to the purpose of the Congress.

345 F.Supp. at 993 (cited in *Friedman, supra*).

 In this case, it is undisputed that Mrs. Pfalzgraf was admitted to Park Shore because her physical condition had deteriorated to the point that family members could no longer care for her at home. As set forth above, Mrs. Pfalzgraf was examined by Dr. Cifuentes upon her admission to Park Shore.

In his admission examination report, Dr. Cifuentes noted that Mrs. Pfalzgraf had a long history of chronic diseases and was progressively getting worse. She was unable to communicate due to senile dementia. She had advanced arthritis, cataracts. diabetes, and urosepsis. Dr. Cifuentes recommended that she receive medical care as needed, at a skilled level (T. 118, 133–34). This evaluation was confirmed by Dr. Cifuentes in a letter to plaintiff's attorneys dated June 24, 1994, in which Dr. Cifuentes stated that Mrs. Pfalzgraf "required skilled assessment to ensure that her conditions were properly monitored and any changes promptly brought to my attention" (T. 103).

Notably, the ALJ did not refer to or even mention Dr. Cifuentes' assessment of the level of care that Mrs. Pfalzgraf received at Park Shore. Instead, the ALJ specifically relied on a report dated August 29, 1995 from Darlene Morrow, R.N. Ms. Morrow reviewed the medical records and made the following findings:

1. [Mrs. Pfalzgraf's] Diabetes was controlled with oral medications as evidenced by stable blood sugars.

2. The urosepsis was treated in the hospital successfully with antibiotics. She had no signs and symptoms of an infectious process while in the facility as evidenced by stable vital signs.

3. Her ketoacidosis was treated and resolved in the hospital. This occurred prior to her admission to Park Shore. Her condition remained stable at Park Shore and she received routine Nursing Care.

4. Her Stage II decubitus does not qualify her for Medicare covered services. Her pressure sore improved from a Stage II to a Stage I.

5. The CNA's [Certified Nursing Assistants] provided her care for all activities of daily living which include: bathing, dressing, grooming, eating, mobility and toileting as her overall condition did not require the skills of technical or professional personnel.

6. Micronase is a commonly used drug in the treatment of diabetes. The Ketoa-

cidosis was resolved in the hospital, therefore, there was no need to monitor her blood sugar on a daily basis to meet the Medicare guidelines.

(T. 21). Based on these findings, Ms. Morrow concluded that Mrs. Pfalzgraf "did not have a condition or special medical complications that required skilled services" (id.).

The ALJ's reliance on Ms. Morrow's assessment, without any reference to Dr. Cifuentes' assessment, is contrary to the requirement that the Secretary accord "some extra weight" to the informed opinion of a treating physician, or supply "a reasoned basis, in conformity with statutory purpose, for declining to do so." *State of New York on Behalf of Holland v. Sullivan*, 927 F.2d 57, 60 (2d Cir.1991) (citing *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir.1988)); *see also Bergeron v. Shalala, supra*, 855 F.Supp. at 668. While the record reflects that Dr. Cifuentes only examined Mrs. Pfalzgraf twice during the relevant period between April 23 and May 31, 1991 (*see* T. 118–19), her general condition remained unchanged. It is undisputed that, as the Medical Director of Park Shore, Dr. Cifuentes was directly responsible for—and personally familiar with—Mrs. Pfalzgrafs condition and her level of care. On the other hand, Ms. Morrow's findings were based solely on her review of the medical file more than four years after the care was actually rendered. The failure of both the ALJ and the Appeals Council to explain why Ms. Morrow's opinion as to the level of care provided was accorded conclusive weight, while the treating physician's opinion was not so much as mentioned, leads this court to the conclusion "that the facts have [not] been evaluated in light of correct legal standards." *Klofta v. Mathews, supra*, 418 F.Supp. at 1141.

In addition, Ms. Morrow's conclusion that Mrs. Pfalzgraf's care was provided by CNAs—as opposed to "technical or professional personnel"—is contradicted by the daily nurse's log (*see* T. 121–132), which shows that virtually all of the care was provided by registered nurses and licensed practical nurses. The daily log also consistently reflects that Mrs. Pfalzgraf received "total care of all ADL's" (*see, e.g.*, T. 132). She could not verbalize her needs, other than single-syllable words or grunts, and "all needs [were] anticipated by staff" (T. 131). She chewed on a rubber pretzel, generally slept in the fetal position, and regularly required care for incontinence. Oral medications and Granulex for her decubitus ulcer were regularly administered.

According to the government, the daily nurse's log demonstrates that no skilled services were rendered to Mrs. Pfalzgraf between April 25 and May 31, 1991. However, the regulations do not require that every individual service rendered to a patient "be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a). Instead, where the patient's physical and mental "condition, age, and immobility create a high potential for serious complications," 42 C.F.R. § 409.33(a)(1), the inference may be drawn that skilled services are being provided "even though the individual services are not skilled." *Id.* The inference in this case is given further support by the fact that all of Mrs. Pfalzgrafs care was provided by professional medical personnel.

The government also contends that there is no care plan in the record, as required by the regulations. This contention is directly contradicted by the "Physician's Order Data Record," which sets forth a "comprehensive care plan" including an indication of the level of care required (skilled), diet, tolerance for alcoholic beverages, lab work, activities, restraints, physical/occupational therapy goals, medications, treatments and other miscellaneous information (T. 118).

Finally, reviewing courts have held that claimants in similar circumstances were receiving skilled nursing care. *See, e.g., Falk v. Chater, supra*, 1995 WL 798915, at *6 (care received at SNF in the form of assessment of urine, monitoring for and treatment of urinary tract infection, irrigation and replacement of catheters, assessment of the effects of medication, assessment of skin integrity, and treatment of decubitus ulcers, considered in conjunction with other medical problems including paraplegia, senile dementia, malnutrition and inability to leave bed,

was "skilled" rather than "custodial"); *Fournier v. Sullivan,* 1990 WL 508746 (D.Conn. 1990) (Medicare coverage granted to elderly alcoholic woman with multiple impairments and related physical and mental disorders resulting from alcoholism who was receiving tests, custodial care, and assessment of her conditions and medications); *Gartmann v. Secretary of Health and Human Services, supra* (coverage provided for aphasic, confused 87–year–old woman diagnosed with hemiplegia, congestive heart failure, atrial fibrillation, large decubitus ulcer and incontinence who received personal and skilled services, and who could not be cared for at home on outpatient basis); *Howard v. Heckler,* 613 F.Supp. 318 (W.D.N.Y.1985) (82–year–old woman suffering from breast, skin and bone cancer, diabetes, overactive thyroid and complications from hip injury who received extensive medication and monitoring of her condition was receiving skilled nursing care). The care rendered to Mrs. Pfalzgraf at Park Shore from April 26, 1991 through May 31, 1991, as reflected by the daily nurse's log and considered in conjunction with the undisputed proof of Mrs. Pfalzgraf's serious and complicated physical and mental condition, requires a similar result in this case.

Accordingly, upon "common sense, non-technical consideration" of the record as a whole, *Friedman v. Secretary of Health and Human Services, supra,* 819 F.2d at 45, and construing the statutory requirements and regulatory guidelines liberally in favor of the beneficiary, *id.,* I find that the Secretary's denial of Medicare Part A coverage for services provided to Mrs. Pfalzgraf from April 26, 1991 through May 31, 1991 at Park Shore Health Care Center was based on an erroneous application of the law, and was not supported by substantial evidence. When there is persuasive proof in the record of entitlement to benefits, and a remand for further proceedings would serve no purpose other than to further delay already lengthy administrative proceedings (here, almost seven years), the decision of the Secretary should be reversed and the case remanded solely for calculation of benefits. *See, e.g., Rivera v. Sullivan,* 923 F.2d 964, 970 (2d Cir.1991); *Fowler v. Bowen,* 866 F.2d 249, 253 (8th Cir.1989); *Parker v. Harris,* 626 F.2d 225, 235 (2nd Cir.1980).

## CONCLUSION

For the foregoing reasons, the Secretary's motion for judgment on the pleadings is denied, the Secretary's determination is reversed, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) solely for the calculation of benefits.

The Clerk of the Court is directed to enter judgment in favor of the plaintiff.

**SO ORDERED.**